## PENNSYLVANIA COMPANY v. ROY.

1. A carrier of passengers for hire is bound to observe the utmost caution, and is responsible to them for such injuries received in the course of their transportation as might have been avoided or guarded against by his exercise of extraordinary vigilance, aided by the highest skill.

2. Such caution and vigilance extend to all the appliances and means used by him in transporting them. He must, therefore, provide cars or vehicles adequate, that is, sufficiently secure as to strength and other requisites, for their safe conveyance, and he is liable in damages if, by reason of the slightest negligence or fault in that regard, injury results to a passenger.

3. A passenger purchased from a railroad company a ticket over its line, and, at the same time, from a palace-car company, a ticket entitling him to a berth in one of its sleeping-cars, constituting a part of the train of the railroad company. In the course of transportation he was injured by the falling of a berth in the sleeping-car in which he was at the time riding. *Held*, that for the purposes of the contract with the railroad company for transportation, and in view of its obligation to use only cars that were adequate for safe conveyance, the palace-car company, its conductor and porter, were, in law, the servants and employés of the railroad company and that the negligence of either of them, as to any matters involving th. safety or security of passengers, was that of the railroad company.

4. In such case, the injured passenger being entitled only to compensatory dam-

ages, evidence as to his poverty, or the number and ages of his children, is irrelevant.

5. Where, before the final submission of the case to the jury, irrelevant evidence, which had been admitted, was withdrawn, and they were instructed to disregard it, — *Held*, that an exception to the action of the court will not be sustained, the presumption being, so far as this court is concerned, that, under such circumstances, the jury based their verdict upon legal evidence only.

ERROR to the Circuit Court of the United States for the Northern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. J. T. Brooks* and *Mr. George Willard* for the plaintiff in error.

*Mr. John Van Arman, contra.*

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a writ of error from a judgment for the sum of $10,000, the amount assessed as damages sustained by the defendant in error, in consequence of personal injuries received while riding, as a passenger, in a sleeping-car which belonged to the Pullman Palace Car Company, but constituting, at the time the injuries were received, a part of a train of cars managed and controlled by the Pennsylvania Company, as lessee and operator of the Pittsburg, Fort Wayne, and Chicago Railway. The action was commenced in the Supreme Court of Cook County, Illinois, against the Pennsylvania Company, the Pittsburg, Fort Wayne, and Chicago Railroad Company, and the Pullman Palace Car Company. It was subsequently dismissed by the plaintiff against all the defendants except the Pennsylvania Company, and then removed for trial. into the Circuit Court of the United States for the Northern District of Illinois, where the judgment complained of was rendered.

The facts set forth in the bill of exceptions, so far as it is material to detail them, are these: —

On the 5th of June, 1876, Roy, the defendant in error, purchased at the office of the lessee company, in the city of Chicago, a "first-class railroad ticket" from that city to Philadelphia, over the line of that company, paying therefor the sum of $14.40. At the same time and place, and of the same

person, he purchased a sleeping-car ticket, issued by the Pullman Palace Car Company, for the route between the same cities, and for that ticket he paid the additional sum of $5. He took the train the same day, going immediately into the section of the sleeping-car corresponding to his ticket.

The next morning, at Alliance, Ohio, upon the invitation of a friend, travelling upon the same train, he entered the sleeping-car in which that friend was riding, and there engaged with him in conversation. While so engaged, the upper berth of the section in which they were sitting fell. Thereupon the porter of the sleeping-car came at once and put up the berth, saying it would not fall again. Shortly thereafter the berth fell a second time, striking the plaintiff upon the head, injuring his brain, incapacitating him from pursuing his vocation, and necessitating medical treatment.

After the second falling of the berth, the brace or arm supporting it was found to be broken.

The evidence introduced by the plaintiff tended also to show that the Pennsylvania Company provided cars in which passengers having railroad tickets could ride without purchasing a sleeping-car ticket; that Roy had much experience in travelling, and would have gone into one of those cars had he not purchased a sleeping-car ticket; that at the time he purchased it he did not know what company ran the sleepers, but upon taking the train he ascertained it was a Pullman car; that the Pullman Palace Car Company was engaged in furnishing cars to be run in the trains of railroad companies; that, besides the general conductor of the train, there was a conductor, in uniform, and a porter, whose duty it was to make up the berths and attend to the wants of passengers occupying the sleeping-car.

Upon the trial the plaintiff introduced a time and distance card of the defendant corporation, issued, published, and circulated by that company during the year 1876, prior to the date of his injuries. That card, referring to the "Fort Wayne and Pennsylvania R. R. line," stated that three express trains left Chicago daily, one "*with popular vestibule sleeping-car*," one "with drawing-room and hotel car," and one "*with drawing-room sleeping-car*." It gave notice that "passage, excursion,

and sleeping-car tickets " could be purchased at the defendant company's office in Chicago. Referring to the " Fort Wayne and Pennsylvania line," the same card announced that " no road offers equal facilities in the number of through trains, *equipped with Pullman palace sleeping-cars.*" It states, among the advantages of the " Pittsburg, Fort Wayne, and Pennsylvania through line," that the latter was the " only line running three through trains, *with Pullman palace-cars,*" and " the only line *running sleeping-cars* from Chicago and intermediate stations to Philadelphia without change." The same card gave the rates charged for berths and sections in Pullman sleeping-cars from Chicago to points east of that city.

The defendant, to maintain the issues on its part, offered to prove —

1. That the sleeping-car in which the accident occurred, and all the sleeping-cars then and theretofore on the defendant's line, since the 27th of January, 1870, were owned by the Pullman Palace Car Company, a corporation of the State of Illinois, and not by the defendant; that said sleeping-cars were run in the same trains with the defendant's cars; that holders of railroad tickets were entitled to ride in said sleeping-cars, provided they also held sleeping-car tickets.

2. That the Pullman Palace Car Company, and it only, issued tickets for sale, entitling passengers to ride in said sleeping-cars; that such tickets were plainly distinguishable from railroad tickets, and were sold at offices established by said company, and indicated as places for the sale of such tickets; that the plaintiff purchased the sleeping-car ticket of the same person of whom he bought the railroad ticket; that the office where purchased indicated by plain lettering upon its door that it was a place for the sale of Pullman Palace Car Company tickets, as well as railroad tickets.

3. That the Pullman Palace Car Company employed persons to take charge of its cars, and the latter, whilst in use, were in the immediate charge of a conductor and a porter employed by that company; that such conductor and porter were the only persons who had authority to manage and control the interior of said cars, and the berths and seats and the appurtenances thereto.

To this proof the plaintiff objected, and the objection was sustained, to which ruling the company excepted.

The court thereupon charged the jury that the proof tended " to show that the injury was received by reason of the negligence of the defendant's agents or servants, or by some negligence in the construction of the car in which the plaintiff was riding." To that charge the company at the time excepted, upon the ground that it was unsupported by the testimony, and because it assumed as a fact that the persons in charge of the sleeping-car were the company's agents or servants.

The court further charged the jury that " the defendant has offered in your presence to prove that the car in which the plaintiff was injured was not the car or the actual property of the defendant, but was the property of another corporation. But I instruct, as a part of the law of this case, that if the car composed a part of the train in which the plaintiff and other passengers were to be transported upon their journey, and the plaintiff was injured while in that car, without any fault of his own, and by reason either of the defective construction of the car or by some negligence on the part of those having charge of the car, then the defendant is liable."

To that charge also the defendant excepted.

We are of opinion that there was no substantial error, either in excluding the evidence offered by the defendant, or in the charge to the jury. The court only applied to a new state of facts, principles very generally recognized as fundamental in the law of passenger carriers. Those thus engaged are under an obligation, arising out of the nature of their employment, and, on grounds of public policy, vigorously enforced, to provide for the safety of passengers whom they have assumed, for hire, to carry from one place to another. In *Philadelphia & Reading Railroad Company* v. *Derby* (14 How. 468), it was said that when carriers undertake to convey persons by the powerful and dangerous agency of steam, public policy and safety require that they be held to the greatest possible care and diligence, — that the personal safety of passengers should not be left to the sport of chance, or the negligence of careless agents. This doctrine was expressly affirmed in *Steamboat New World* v. *King*, 16 id. 469. In *Stokes* v. *Saltonstall* (13 Pet. 181),

affirming the decision of Mr. Chief Justice Taney on the circuit, we said, that although the carrier does not warrant the safety of the passengers, at all events, yet his undertaking and liability, as to them, go to the extent that he or his agents, where he acts by agents, shall possess competent skill, and, as far as human care and foresight can go, he will transport them safely. The principles there announced were approved in *Railroad Company* v. *Pollard* (22 Wall. 341), where, speaking by the present Chief Justice, we said that we saw no necessity for reconsidering *Stokes* v. *Saltonstall*.

These and many other adjudged cases, cited with approval in elementary treatises of acknowledged authority, show that the carrier is required, as to passengers, to observe the utmost caution characteristic of very careful, prudent men. He is responsible for injuries received by passengers in the course of their transportation which might have been avoided or guarded against by the exercise upon his part of extraordinary vigilance, aided by the highest skill. And this caution and vigilance must necessarily be extended to all the agencies or means employed by the carrier in the transportation of the passenger. Among the duties resting upon him is the important one of providing cars or vehicles adequate, that is, sufficiently secure as to strength and other requisites, for the safe conveyance of passengers. That duty the law enforces with great strictness. For the slightest negligence or fault in this regard, from which injury results to the passenger, the carrier is liable in damages. These doctrines to which the courts, with few exceptions, have given a firm and steady support, and which it is neither wise nor just to disturb or question, would, however, lose much, if not all, of their practical value, if carriers are permitted to escape responsibility upon the ground that the cars or vehicles used by them, and from whose insufficiency injury has resulted to the passenger, belong to others.

The undertaking of the railroad company was to carry the defendant in error over its line in consideration of a certain sum, if he elected to ride in what is known as a first-class passenger car; with the privilege, nevertheless, expressly given in its published notices, of riding in a sleeping-car, *constituting a*

*part of the carrier's train,* for an additional sum paid to the
company owning such car.

As between the parties now before us, it is not material that
the sleeping-car in question was owned by the Pullman Pal-
ace Car Company, or that such company provided at its own
expense a conductor and porter for such car, to whom was
committed the immediate control of its interior arrangements.
The duty of the railroad company was to convey the passen-
ger over its line. In performing that duty, it could not, con-
sistently with the law and the obligations arising out of the
nature of its business, use cars or vehicles whose inadequacy or
insufficiency, for safe conveyance, was discoverable upon the
most careful and thorough examination. If it chose to make
no such examination, or to cause it to be made; if it elected
to reserve or exercise no such control or right of inspection,
from time to time, of the sleeping-cars which it used in con-
veying passengers, as it should exercise over its own cars, — it
was chargeable with negligence or failure of duty. The law
will conclusively presume that the conductor and porter, as-
signed by the Pullman Palace Car Company to the control
of the interior arrangements of the sleeping-car in which Roy
was riding when injured, exercised such control with the assent
of the railroad company. For the purposes of the contract
under which the railroad company undertook to carry Roy
over its line, and, in view of its obligation to use only cars
that were adequate for safe conveyance, the sleeping-car com-
pany, its conductor and porter, were, in law, the servants and
employés of the railroad company. Their negligence, or the
negligence of either of them, as to any matters involving the
safety or security of passengers while being conveyed, was
the negligence of the railroad company. The law will not
permit a railroad company, engaged in the business of carry-
ing persons for hire, through any device or arrangement with
a sleeping-car company whose cars are used by the railroad
company, and constitute a part of its train, to evade the duty
of providing proper means for the safe conveyance of those
whom it has agreed to convey. 2 Kent, Com. 600, 12th ed.;
2 Parsons, Contracts, 218, 219, 6th ed.; Story, Bailments,
sects. 601, 601 *a*, 602; Cooley, Torts, 642; Wharton, Negli-

gence (2d ed.), sect. 627 *et seq.*; Chitty, Carriers, 256 *et seq.*, and cases cited by the authors.

It is also an immaterial circumstance that Roy, when injured, was not sitting in the particular sleeping-car to which he had been originally assigned. His right, for a time, to occupy a seat in the car in which his friend was riding was not, and, under the facts disclosed, could not be questioned.

Whether the Pullman Palace Car Company is not also, and equally, liable to the defendant in error, or whether it may not be liable over to the railroad company for any damages which the latter may be required to pay on account of the injury complained of, are questions which need not be here considered. That corporation was dismissed from the case, and it is not necessary or proper that we should now determine any question between it and others.

Upon the trial below, the plaintiff was allowed, against the objection of the defendant, to make proof as to his financial condition, and to show that, after being injured, his sources of income were very limited.

This evidence was obviously irrelevant. The plaintiff, in view of the pleadings and evidence, was entitled to compensation, and nothing more, for such damages as he had sustained in consequence of injuries received. But the damages were not, in law, dependent in the slightest degree upon his condition as to wealth or poverty. It is manifest, however, from the record, that the learned judge who presided at the trial subsequently recognized the error committed in the admission of that testimony. After charging the jury that the measure of plaintiff's damages was the pecuniary loss sustained by him in consequence of the injuries received, and after stating the rules by which such loss should be ascertained, the court proceeded: "But the jury should not take into consideration any evidence touching the plaintiff's pecuniary condition at the time he received the injury, because it is wholly immaterial how much a man may have accumulated up to the time he is injured; the real question being, how much his ability to earn money in the future has been impaired."

Notwithstanding this emphatic direction that the jury should

exclude from consideration any evidence in relation to the pecuniary condition of the plaintiff, the contention of the defendant is, that the original error was not thereby cured, and that we should assume that the jury, disregarding the court's peremptory instructions, made the poverty of the plaintiff an element in the assessment of damages; and this, although the record discloses nothing justifying the conclusion that the jury disobeyed the directions of the court. To this position we cannot assent, although we are referred to some adjudged cases which seem to announce the broad proposition that an error in the admission of evidence cannot afterwards be corrected by instructions to the jury, so as to cancel the exception taken to its admission. But such a rule would be exceedingly inconvenient in practice, and would often seriously obstruct the course of business in the courts. It cannot be sustained upon principle, or by sound reason, and is against the great weight of authority. The charge from the court that the jury should not consider evidence which had been improperly admitted, was equivalent to striking it out of the case. The exception to its admission fell when the error was subsequently corrected by instructions too clear and positive to be misunderstood by the jury. The presumption should not be indulged that the jury were too ignorant to comprehend, or were too unmindful of their duty to respect, instructions as to matters peculiarly within the province of the court to determine. It should rather be, so far as this court is concerned, that the jury were influenced in their verdict only by legal evidence. Any other rule would make it necessary in every trial, where an error in the admission of proof is committed, of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew. A rule of practice leading to such results cannot meet with approval.

There was, however, an error committed upon the trial, to which exception was duly taken, but which does not seem to have been remedied by any portion of the charge appearing in the bill of exceptions. The plaintiff was permitted, against the objection of the defendant, to give the number and ages of his children,— a son ten years of age, and three daughters

of the ages, respectively, of fourteen, seventeen, and twenty-one. This evidence does not appear to have been withdrawn from the consideration of the jury. It certainly had no legitimate bearing upon any issue in the case. The manifest object of its introduction was to inform the jury that the plaintiff had infant children dependent upon him for support, and, consequently, that his injuries involved the comfort of his family. This proof, in connection with the impairment of his ability to earn money, was well calculated to arouse the sympathies of the jury, and to enhance the damages beyond the amount which the law permitted; that is, beyond what was, under all the circumstances, a fair and just compensation to the person suing for the injuries received by him. How far the assessment of damages was controlled by this evidence as to the plaintiff's family it is impossible to determine with absolute certainty; but the reasonable presumption is that it had some influence upon the verdict.

The court, in a manner well calculated to attract the attention of the jury, withdrew from their consideration the evidence in regard to the financial condition of the plaintiff; but as nothing was said by it touching the evidence as to the ages of his children, they had the right to infer that the proof as to those matters was not withdrawn, and should not be ignored in the assessment of damages

For this error alone the judgment is reversed, and the cause remanded for a new trial.

*So ordered.*