## THE MANHASSET.

*(District Court, E. D. Virginia. February 24, 1884.)*

1. ADMIRALTY PRACTICE—LIBEL—AMENDMENT.

In a case in admiralty where the *res* is the same, and the tort and the contract for which damages are claimed are the same, and where the original libel sets out matter enough by which to amend, a libel may be amended as to parties by changing the character in which the libelant sues, and dismissing as to the parties who have no right to sue.

2. SAME—ACTION FOR DEATH CAUSED BY NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.

Where, in a libel for damages for the killing of a husband and father, the ferry steamer inflicting the injury was in fault, but the deceased had violated rules of the managers, forbidding passengers to step over guard-chains and passing off to the wharf before the boat was drawn up and made fast at the landing, in doing which deceased received fatal injuries, but in doing so only did what men and boys habitually and constantly did on the ferry, without restraint or remonstrance from the management, *held*, that this was not such contributory negligence on the part of deceased as to exonerate the claimants from responsibility in damages, the managers of the ferry having, by neglecting to enforce their rules, held out to passengers that there was no practical danger in violating them, and thereby put the deceased off his guard as to the danger attending the practice, which was habitually permitted.

In Admiralty, in a Libel for Damages.

After the decision rendered in this case on the question of jurisdiction, on the fifth of January, 1884, (18 FED. REP. 918,) the libelant moved for leave to dismiss the original libel as to herself, as administratrix of William H. Black, and to file an amended libel in her individual character as widow of Black, and in her character as guardian of the two minor children of the deceased. This motion was granted, on the ground that the *res* was the same, the *tort* and contract on which the claim for damages was leased was the same, and that the original libel contained all the facts as to parties that were necessary to amend by.

William H. Black, whose widow, Frances Black, brings this libel, was a colored man, 64 years old, who had irregular employment at $2.50 a day in the carpenter-shop of the United States navy-yard, at Gosport, opposite Norfolk, and lived on the Norfolk side of Elizabeth river, some distance westward of Norfolk, where he had a farm of about 120 acres of land. Returning from the navy-yard, after fail-

ing to get work, on the morning of March 18, 1881, the weather being somewhat rainy, Black got upon the ferry-boat Manhasset to cross over to Norfolk. He was engaged in earnest conversation, on the passage, with George Mason, a colored deck-hand, on the subject of politics. The weight of testimony is that Black, on the approach of the boat to the Norfolk landing, had got outside the chains which are stretched as a guard in front of the gangways to prevent the egress of passengers and teams until the boat can be secured. It was also stated in evidence that he was, while standing beyond the chains, before the boat had touched the landing, still conversing with Mason, the deck-hand, who also had stepped beyond the chains. The weight of evidence is that the chains were all still up when Black was at the front edge of the boat, conversing and ready to step off. When the boat had got within 18 inches of the float, or dock, to which it was to be fastened, Mason stepped off to hook the boat's chain to a windlass, and to draw the boat up fast to the landing. As Mason stepped off for this purpose, Black also stepped off; in doing which, Black's foot slipped, and he fell forward, with his body partly upon the float. Mason and another man seized hold of Black as he fell, but were unable to draw him upon the float before the other foot was caught and crushed by the boat, which was coming slowly with a side motion to the float. Medical aid was immediately brought to Black, but his injury terminated fatally on the morning of the twenty-fifth of March, just one week after the accident happened.

At that time three chains were used as guards, in front of this boat, to prevent the premature egress of passengers and teams. One small chain stretched across the gangway of the white passengers, on the right-hand side of the boat, one end of which was fastened to the side of the boat, and the other hooked to a post on the left of that gangway. A large chain stretched across the team gangway, in the middle of the boat. A small chain, quite long, stretched across the colored people's gangway on the left of the boat, and also across the team gangway in the middle, to the post on the right of the team gangway, and hooked to the same post on which the small chain across the white people's gangway was hooked. This long chain was fastened to the left side of the boat. The weight of evidence, as before said, is that all of these chains were still up, and none of them had been lowered, when Black was standing in front of them, conversing with Mason, and ready to step off to the float. It was not Mason's duty to let down the chains at the time of the landing of the boat; and he did not do so on the occasion of this accident. It was the duty of the white deck-hand, Montague, to let the chains down; and Montague swears, I think with truth, that he had not let them down before the accident happened to Black. Mason's place of duty, on this occasion, was on the left side of the boat, forward of the colored people's gangway. Montague's place of duty was on the right

side of the team gangway at the post to which one end of each of the three chains that have been described was hooked.

It is proved that it was the habit of men and apprentice boys to pass off the boat before it had reached and had been made fast to the dock, and that not unfrequently the chains were lowered by passengers before the deck-hands in charge were at liberty to do so, under the rules and regulations prescribed to them by the managers of the ferry. It is not shown that the authorities of the ferry did more than give very proper orders for the safety of passengers, in respect to keeping the gangways closed. It is not shown that they did anything effectual towards preventing the premature egress of passengers during those critical moments while the boat is approaching the dock, or took any practically effective measures for preventing the habitual violation of their wise rules and regulations in this respect. On the occasion on which Black received his injury several other persons are proved to have passed over the chains and stepped to the float before the boat had landed and been made fast. It is proved that the principal ferries of the north have adopted, and have been using for several years, a patented set of gates, called "the Frazee Patent Safety Gates," designed for preventing passengers from incurring the hazard of injury by passing from ferry-boats before they have been made fast.

W. H. & J. J. Burroughs, for libelant.

J. F. Crocker and Sharp & Hughes, for claimant.

HUGHES, J. I think the foregoing statement of the facts of this case embodies all that is material to its decision. There is no doubt that the managers of the ferry-boats made good and wise rules for securing the safe transportation of passengers. These rules forbade all persons to leave their boats until the guard-chains before the several gangways were lowered; and rigidly forbade the deck-hands from lowering the chains before the boats were drawn close to the dock and made fast. That part of the evidence reflects the highest credit upon the management. The residue of the evidence, however, is less satisfactory. It shows that men and apprentice boys habitually violated the rules of the ferry. It shows that this class of passengers frequently themselves let down the chains which stretched in front of the passenger gangways, without waiting for the deck-hands to do so; and that they did this frequently, and when not doing it, habitually got over the chains and leaped off the boats before they were drawn up and made fast to the dock. It shows that this was all done without check or hinderance from the management of the ferries. Now it is but little short of mockery to say that rules, the best and wisest conceivable for the safety of human life are made by common carriers, and at the same time to admit that they allow these rules to be continually and habitually violated. The impatience of passengers to precipitate themselves pell-mell off of ferry-boats is a matter of constant observation; and the managers of well-regulated ferries else-

where, in view of this notorious and apparently uncontrollable propensity, acknowledge their obligation to provide against the dangers attending it by adopting contrivances which physically prevent this unreasoning press of passengers for egress, and effectually insure against the dangers incurred. I will not say that the ferry-boats which ply across Norfolk harbor are under legal obligation (as one or two other classes of common carriers are) to provide the latest and most approved contrivances that have been invented, for insuring the safety of their passengers; but I am bound to say that it is their duty to do more than adopt wise, cautionary rules for the purpose,—it is their duty to take effectual measures for enforcing, from all passengers, a certain and absolute obedience to those rules.

The obligations of the carriers of passengers on this subject are laid down by the courts in very stringent terms. Federal courts take the law from the supreme court of the United States; and that tribunal, in a late case, (*Penn. Co.* v. *Roy*, 102 U. S. 455, 456,) reviewing previous cases, declared that when carriers undertake to convey persons by the powerful and dangerous agency of steam, public policy requires that they shall be held to the greatest possible care and diligence; that the personal safety of passengers should not be left to the sport of chance or the negligence of careless agents; that although a carrier does not warrant the safety of passengers at all events, yet his undertaking and liability as to passengers go to the extent that he or his agents shall possess competent skill, and, as far as human care and foresight can go, he will transport them safely; and that he is responsible for all injuries received by passengers, which might have been avoided by the exercise on his part of extraordinary vigilance, aided by the highest skill.

These propositions may be regarded as the settled and accepted law of the subject in this country, and they are the law of this case. The obligations of the authorities who controlled the Manhasset are determined by them, and they show that there was fault on the part of this ferry-boat; and therefore, if the accident which happened to Black, a grown and sane man, had happened to a child or other person unpossessed of ordinary discretion, the liability of the Manhasset would have been indisputable. But Black was a man of responsible age and discretion; and the law, tender as it is of the safety of passengers on steam vehicles, yet lays down the counter-principle that every man is bound, no matter in what he may be engaged, to use ordinary care for his own protection, and no man is bound to use more; so that if a man of discretion is negligent in taking care of himself, and *contributes* by that negligence to bring upon himself the accident by which he suffers, he, in general, relieves the carrier from the obligation of compensating him in damages.

The application of these counter doctrines of the rigid responsibility of carriers to passengers, and of the *contributory negligence* of the person injured, is one of the most difficult tasks that devolve upon

courts, and is especially difficult in the present case. The question here is, whether Black, by stepping over the guard-chains of the ferry-boat and then attempting to leap from the boat to the float before she was made fast, "contributed" to the accident to such a degree as, under all the circumstances of the occasion, to exonerate the boat from responsibility. That the boat was in *fault* has already been stated; that Black was more or less reckless in his conduct is equally true; and the question of law is whether his conduct was of such a character as to relieve the boat of *responsibility* for the accident in damages. Now, if Black had not been a customary passenger on that ferry, or if, of those who habitually made that passage, he was the only person, or one of a few persons, who took the hazard of passing the chains and leaping the chasm before the boat was made fast, then the case would be free from much of its difficulty. It would resemble in principle the case of *Railroad Co.* v. *Jones,* 95 U. S. 439. But Black had passed the ferry often enough to know what its authorities habitually allowed in respect to this matter. He was familiar with the fact that passengers habitually overstepped the chains and strided the chasm without hinderance or rebuke from them. The managers thus gave out to the public, as if it was their opinion, that the practice was practically safe and unattended with danger. Printed rules there may have been; chains were in fact stretched formally before the eyes of passengers; but passengers were seen and notoriously known to disregard them by the half dozen or dozen on every trip. The question, therefore, resolves itself into this: was Black not thrown off his guard? Was it not held out to him habitually by the managers, that, practically, there was no danger? Was anything presented to arrest his attention and to warn him of the fate which overtook him? I think the evidence in the case leaves room for but one answer to this, the crucial question of this case.

The case turns upon this question, because it is a principle of the law of contributory negligence that a carrier is not necessarily excused because the injured person knew that *some* danger existed through the carrier's neglect, and voluntarily incurred the danger. *Clayards* v. *Dethick,* 12 Q. B. 439. Where, for instance, a traveler crossed a bridge which he knew to be *somewhat* unsafe, but which its managers had not closed, nor warned the people not to pass, and the traveler's horse fell through and was killed, it was held that he was not in fault, and damages were recovered. *Humphreys* v. *Armstrong Co.* 56 Pa. St. 204. So it was held that the plaintiff might recover where a passenger train was moving very slowly by, but did not stop at a depot where it should have stopped, and a passenger was injured by leaping off, notwithstanding the usual warning that passengers must not get off the train while in motion, the slow gait of the train seeming to invite the passenger to get off. *Filer* v. *N. Y. Cent. R. Co.* 49 N. Y. 47. These cases sufficiently illustrate the principle of the law of contributory negligence, that though the

passenger must do what a prudent person should do to avoid accident in any particular circumstance, in which he may stand, yet if he has reason to infer from the conduct and policy of the carrier that no practical danger would attend an act, though there might be some risk, and if he is thereby thrown off his guard respecting it, the carrier is liable.

I do not feel called upon to review the myriad of cases on this subject which fill the reports of the courts, or to dwell upon the confusing and confounding niceties of distinction which are drawn by the text-writers in digesting these cases. Suffice it to say that I am of opinion, though it has been arrived at with diffidence and some doubt, that the Manhasset is liable in this action.

I will now allude to a question of jurisdiction which was raised at bar, to the effect that the *tort* in this case was not maritime, and not within the cognizance of admiralty; inasmuch as Black, when he fell upon the float, just as he received the injury to his foot, was, as a matter of fact, on land, and not on the boat; it being certain that if he had already got upon the float, and was standing upon it, the *tort* would not have been maritime. See *The Plymouth*, 3 Wall. 20, and *The Mary Stewart*, 5 Hughes, 312.[1] This view of the case is defeated by the consideration that the *tort* was inflicted by the boat while Black was in the act of leaving her, and before he had completed the act of landing. But even if this were not so, it is only with respect to *torts* that maritime locality is essential to the admiralty jurisdiction. In respect to *contracts* the rule does not hold; if the contract is maritime in its character, the locality where it is made is immaterial. In this case there was not only the *tort* of inflicting an injury resulting in death, but a *contract* to carry the passenger and to land him safely at Norfolk. The damages he received will be of the double character of a satisfaction for the breach of contract and for the *tort*. But I insist that it was the boat which inflicted the injury, and that the injury was inflicted upon a part of the body of the deceased man which had not yet landed, and which was injured by reason of its being still on the water. I know that this distinction would seem over-nicely drawn, but questions of law very often depend upon nice distinctions, and when they do it is necessary to draw them.

Assuming, on the whole case, that the libelant is entitled to recover damages, the final question is what these should be. The amount depends upon the question, how much of his earnings could the deceased have bestowed upon the libelants as their sustenance if he had lived? He owned a farm; and that, of course, is still left to them. Beyond this the evidence gives us but little to build an estimate upon. His precarious employment and wages at the navy-yard afford no certain basis for a calculation. Driven to conjecture, my

---

[1] S. C. 10 FED. REP. 137.

estimate must be very moderate; the more moderate, as this man had entered the period of old age, and could not, in the course of nature, be supposed to have continued long to spare from his own support a surplus for the sustenance of those dependent on him. It is the custom and the duty of the young to support the aged when they have entered, the period of old age. At the age of 64 the tables of vitality show that Black's expectation of life was seven years and a half. If we assume that he could during this period of old age have spared an average of $75 a year to the use of the libelants, then we should arrive at an award of $562.50 as the damages to be allowed in this case. I will give a decree for that amount, and for the costs of this suit.