M. C. WATSON, Administratrix, v. THE WHITEVILLE LUMBER COMPANY.

(Filed 10 November, 1910.)

1. Negligence — Independent Contractor — Damages — Master and Servant—Respondeat Superior.

The defense of an independent contractor is not available when from the contract it appears that he was to cut and haul logs on the defendant's logging road to its main line where it received them; and that plaintiff's intestate was killed on the main line through the negligent running of the locomotive, under defendant's orders, for other purposes than those embraced in the contract. In such instances the contractor acts as the agent of the employer, and a charge by the court making defendant's liability depend upon whether the intestate was killed at a point covered by the contract cannot prejudice it.

2. Instructions—Evidence—Harmless Error.

In an action for damages for the negligent killing of plaintiff's intestate the admission in evidence from a witness that the intestate was kind to his family was rendered harmless by the correct instruction of the court upon the question of the measure of damages.

3. Instructions—Jury—Incorrect Arguments—Harmless Error.

Under our statute, attorneys have the right to argue both the law and facts to the jury, and an argument made by plaintiff's counsel, in an action to recover damages for the wrongful killing of his intestate, that the jury could take into consideration the value of the intestate "to his family in his care and oversight," is not reversible error when it appears that the trial judge correctly instructed the jury upon the issue as to damages.

APPEAL from *Ferguson, J.,* at the July Term, 1910, of Co-LUMBUS.

This action was brought by M. C. Watson, administratrix of D. J. Watson, to recover damages for the alleged negligent killing of D. J. Watson, the intestate of plaintiff, on the night of 17 April, 1909, by being run over by a logging train operated on the line of railway of the defendant company. The line of railway was 12 to 15 miles in length, one terminus being at defendant's mill at Vineland, and the other beyond where plaintiff's intestate was killed. It had been much used by the public as a walkway for about seven years. Plaintiff's intestate was a deaf mute, about 67 years of age, and was walking on the track when killed. The train that produced his death was running in the same direction as deceased was walking; it was running from 15 to 20 miles per hour; its engine had no headlight or other light upon it; the night was dark; no one on the train had any knowledge that plaintiff's intestate had been run over, though one witness, who was on it, stated that he felt the jolt without knowing what caused it; no signal of any kind was given indicating the approach, except the noise of its movement. The deceased was industrious, able-bodied, in good health and active for his age. He was a farmer, but did other work such as cutting crossties, etc. His Honor submitted the following issues:

1. Was the intestate of the plaintiff injured by the negligence of the defendant as alleged in the complaint?

2. Did the intestate of the plaintiff, by his own negligence, contribute to any injury he may have received?

3. Notwithstanding the negligence of the plaintiff's intestate, if the jury should find he was negligent, could the defendant by the exercise of ordinary care have avoided the injury?

4. What damage, if any, is the plaintiff entitled to recover?

The jury answered the first issue, "Yes," the second issue "No," and the third issue "Yes," and the fourth issue "Two thousand dollars." Judgment was accordingly rendered for the plaintiff, from which defendant appealed to this Court.

*McLean & McLean* and *Donald MacRacken* for plaintiff.

*J. B. Schulken, D. J. Lewis* and *Aycock & Winston* for defendant.

153—25

MANNING, J.   A careful examination of the record, including the chàrge of his Honor to the jury, which is set out *in extenso,* convinces us that the case was fairly tried and no error was committed which entitles the defendant to a new trial. The two assignments of error most earnestly insisted upon relate first to the admission of certain evidence and the remarks of counsel on the question of damages embraced in the fourth issue; and second, the refusal to give a special instruction predicated upon the evidence that at the time of the negligent killing of deceased, the train was operated by the employees of R. S. Williams, an independent contractor.   This instruction was as follows: "If the jury find from the evidence that plaintiff's intestate was killed by an engine and cars, and that said engine and cars were operated by employees of R. S. Williams, and that the said R. S. Williams had control and management of said engine and cars at the time of the injury complained of under the contract put in evidence, then he would be an independent contractor and the defendant company would not be responsible for the acts of his employees, and you should answer the first issue, No." The contract between Williams and the defendant was in writing and was offered in evidence.   By its terms, Williams was to cut and haul logs to defendant's main line, where they were received by defendant, the defendant furnishing the engine and cars to Williams.   The overwhelming weight of the evidence fixed the place of the accident on the main line of defendant; and it was uncontradicted that the employees of Williams, at the time of the accident, were operating the train, not in hauling logs, but in returning the engine under defendant's orders for examination to defendant's mill at Vineland.   So, assuming (but it is not clear that the stipulation of the contract touching the right of the defendant to direct and control Williams, especially in view of certain statements made by Williams in his testimony his obedience to directions given him by defendant as to the performance of his work, create the relationship of employer and independent contractor) that the contract created the relation of independent contractor between Williams and the defendant, his Honor would have, in our opinion, upon the evidence, been justified in instructing the jury that the contract did not em-

brace the work Williams was engaged in at the time of the accident—he was then but acting as the agent or servant of the defendant. However, his Honor made the defendant's liability to depend upon whether the intestate was killed at a point covered by the contract between Williams and the defendant, and in so doing we do not think the defendant has any just cause of complaint.

In the course of the trial, the defendant, by its cross-examination of plaintiff's witnesses, attempted to show that the intestate had no earning capacity; was supported by his sons, and was unable to support himself; and it inquired into the number and ages of his children. After this latitude taken by the defendant, his Honor permitted the plaintiff thereafter to ask one witness who raised the intestate's children, and if he was kind and attentive to his family. The defendant concedes that his Honor correctly instructed the jury as to the measure of damages, and in concluding this part of his charge, he said: "You allow nothing for suffering, you do not attempt to punish the railroad, but you seek to give a fair, reasonable pecuniary worth of the deceased to his family under the rule which I have laid down. You should rid yourself of all prejudice, if you have any, and of sympathy. It is not a question of sympathy; it is just a plain, practical question, and you should give a reasonable and fair verdict upon all the issues." More than once, in his charge, his Honor, referring to the argument of counsel addressed to the jury, admonished them that they must find the facts from the evidence and be guided by the law as he gave it to them. Assuming, as we must, that the jury was composed of men of intelligence and character, we cannot see how they could have been misled, under the charge of his Honor and his frequent admonitions to them of their duty, by the argument of counsel. The language of plaintiff's counsel, to which objection was made at the time, was that the jury could take into consideration the value of the deceased to his estate and "his value to his family in his care and oversight." His Honor, in addition to what we have quoted from his charge, specifically instructed the jury what they could consider in determining the damages sustained, to-wit: the age of the deceased, his prospects

in life, his habits, his character, his industry and skill, the means he had for making money, the business in which he was engaged. With these explicit instructions, we do not perceive how men of intelligence could have been misled by an argument of counsel based upon an erroneous view of the law. It must be conceded that as counsel have, under our statute, the right to argue both the law and the facts to the jury, that it is probable that some one of the counsel may submit an argument to the jury based upon a misapprehension of the law governing the case. His Honor corrects this in his charge, and we think he did so fully in this case. We do not think his Honor violated the rule laid down in *Hopkins v. Hopkins,* 132 N. C., 29 ;*R. R. v. Simmons,* 105 Va., 657; *Pa. R. R. v. Ray,* 102 U. S., 451. Finding no reversible error in the trial, the judgment is affirmed.

No error.