Lucy HALDANE, administratrix of the estate of Boyd Haldane, Deceased, Plaintiff,

v.

ALASKA AIRLINES, Inc., a corporation, Defendant.

No. 3391-KA.

District Court, Alaska
First Division, at Ketchikan.

Dec. 8, 1954.

A. H. Ziegler, of Ziegler, Ziegler & Cloudy, Ketchikan, Alaska, for plaintiff.

John H. Dimond, Juneau, Alaska, for defendant.

FOLTA, District Judge.

Plaintiff, as widow and administratrix, seeks to recover, under Sec. 61–7–3 of the Alaska Code, the statutory maximum of $15,000 for the death of her husband.

The defendant is a common carrier. On June 16, 1953, the plaintiff was a passenger on one of its planes on a flight of about 15 minutes' duration between King Salmon and Kvichak, Alaska. The passengers entered the plane at King Salmon through the rear door on the left side, the only door in the cabin. The float at which the passengers were discharged at Kvichak was maintained by the Alaska Packers Association immediately adjacent to its wharf. It may be presumed, although it was not shown, that it was maintained exclusively for the accommodation of airplanes.

When the plane landed on the Kvichak River and taxied to the float the tide was ebbing and there was a current estimated at more than five knots at the float. The plane landed with the current but against the wind. The pilot then attempted to maneuver the plane with its left side to the float, apparently to permit the passengers to leave the plane by the door through which they had entered at King Salmon, but was unsuccessful because of the current. The plane was then allowed to drift away from the float and was maneuvered under power into a starboard landing at the float.

The deceased sat on the rearmost seat athwart the cabin. The other seats were of the bucket type, on the right side of the cabin. Three other passengers occupied these seats. The fifth passenger, Leask, sat in the co-pilot's seat at the right of the pilot. The plane was tied up by one Munson, apparently as an accommodation, at least it was not shown that he was an employee of either the defendant or the Alaska Packers Association. Leask testified that after the motor was shut off and the plane tied up the pilot directed him to leave by the right cockpit door and opened it for him. The pilot testified that he put his head into the cabin and informed the four pas-

sengers that they were to leave the plane through the cockpit. Leask and one of the other passengers testified that he had heard no such direction to the passengers. Leask got out and stood near the plane. Immediately thereafter there was a splash and the exclamation "Man overboard," from the adjacent wharf and from Munson. Leask testified that he looked under the plane and saw the deceased, apparently just as he came to the surface; that it looked to him as though the deceased could not see at the moment because of water in his eyes, and that the deceased made no attempt to grasp any part of the plane. Perhaps it should be noted at this point that the water of the Kvichak River, at least in the summer, is muddy and silty. Leask testified that the deceased was near the outward pontoon, beyond his reach from the inshore pontoon.

It was a crucial period. It would seem that ordinary measures taken immediately would have sufficed to effect the rescue of the deceased, but the testimony leaves the impression that no measures commensurate with the danger were taken.

The pilot testified that he heard the splash and concluded some one had dropped a piece of baggage overboard. He also testified that he heard only the exclamation "Overboard," but since it was proved that in a statement made the day after the accident the pilot stated that he heard the exclamation "Man overboard," I am inclined to believe that he was impeached on this score.

Leask testified that as soon as he saw the deceased in the water he suggested the casting of the plane adrift. The pilot testified that he entered the cockpit, opened the door on the left side, and looked to the rear of the plane, where he saw the deceased being carried off by the current. He then picked up a rope between the seats in the cockpit with the idea of throwing it to the deceased but soon concluded that the deceased was too far away. It was not until then that the plane was cast adrift, when it became apparent that it would never overtake the deceased, whereupon the motor was started but by that time it was too late. The deceased had disappeared. The fact that boats had arrived on the scene to attempt to save the deceased sheds much light on the time which had elapsed.

The plaintiff contends that the defendant was negligent in several particulars: (1) that neither the plane nor the float was equipped with life saving apparatus; (2) that the pilot failed to exercise the care required of a common carrier in seeing that the passengers left the plane by the proper door, and (3) that the pilot was negligent in failing to take immediate and adequate measures to rescue the deceased.

The defendant contends that the deceased lost his life as a result of his own negligence in leaving the plane by the left door, contrary to the directions of the pilot.

The deceased was an Indian, 50 years old, whose principal occupation was fishing. He could not swim and was not a seasoned traveler by air.

■■ A common carrier is required to exercise the highest degree of care for the safety of its passengers, and is liable for the slightest negligence. Pennsylvania Co. v. Roy, 102 U.S. 451, 456, 26 L. Ed. 141; The Korea Maru, 9 Cir., 254 F. 397, 399. A carrier by air is under the same obligation, 4 Shearman and Redfield on Negligence 1683, Sec. 729. All carriers must furnish a safe place for their passengers to alight. Ruffin v. Atlantic & N. C. R. Co., 142 N.C. 120, 55 S.E. 86, as well as to see that they do not fall overboard. 48 Am.Jur. 250, Sec. 367. Although the pilot testified that he had directed the passengers to leave the plane through the cockpit door, two of the passengers, including the one who was in the co-pilot's seat, testified that they did not hear the pilot give any such direction. Had the passengers been so directed, it is incredible that the deceased would have immediately gone through the cabin door. The reasonable inference is that he assumed, in the absence of any direction, that the passengers were to

leave the plane by the same door through which they entered it at King Salmon.

I find, therefore, that the pilot failed to direct the passengers, apparently in the belief that they would see him and the passenger who rode in the cockpit get out of the plane and would follow. This would be a reasonable assumption if the passengers had been seasoned travelers and were able to see the pilot or the passenger referred to, leave the plane, but for all that appears, the deceased might have slept during the flight or he might not have noticed that the plane, on its second approach to the float, was made fast with its right side thereto. Certainly there is no evidence that he knew of any door leading from the cockpit to the float, and it must be admitted that it is unusual for passengers to leave or board a plane by way of the cockpit when there is a door to the cabin. Indeed, there would appear to be no other reasonable explanation. What happened after that is a matter of conjecture. It would appear that the onlookers on the wharf could have shed some light on what actually happened, but they were not produced. The pilot testified that passengers would have to debark by going out of the cabin door backwards, but it appears that there were no handholds. From the step below the door the passengers would alight on the pontoon. Since one could slip on the inshore pontoon as well as on the outboard pontoon, the use of the latter would not involve any greater hazard, except for the custom of the pilot to assist the passengers from the plane. The unavailability of this assistance to the deceased points up the necessity of making clear to the passengers the manner in which they should leave the plane.

■■ I find that in failing to direct the passengers as to the door by which they should leave the plane, there was a failure to observe that degree of care which is imposed on carriers. I further find that the defendant failed to sustain the burden of proof that the deceased was contributorily negligent. Accordingly, I find that the failure on the part of the pilot in the respect pointed out was the proximate cause of the death of the deceased.

■ It is conceded that the loss of future earnings of the deceased over the period of his life expectancy would exceed the amount sought to be recovered by this action and hence I conclude that the plaintiff is entitled to recover the amount sued for.