Stephanie GINGELESKIE, Executrix of the Estate of Joseph Peter Gingeleskie, and Stephanie Gingeleskie, individually, Plaintiffs,

v.

WESTIN HOTEL COMPANY, dba Westin Hotels and Resorts, et al., Defendants.

CIV No. 95–014 PHX–PGR.

United States District Court, D. Arizona.

March 14, 1997.

Mark A. Sippel, Tempe, AZ, Arthur Ian Miltz, Livingston, NJ, for Stephanie Gingeleskie.

Stephen M. Bressler, Douglas L. Irish, Lewis & Roca, Phoenix, AZ, Brian Michael Goodwin, Martin P. Clare, Mitten Goodwin & Raup, P.C., Phoenix, AZ, Thomas F. Daly, McCarter & English, Newark, NJ, John B. Beckworth, Beckworth & Carrigan, L.L.P., Houston, TX, for Westin Hotel Co.

Douglas Michael Schumacher, Douglas M. Schumacher, P.C., Scottsdale, AZ, for Supershuttle of Arizona, Inc., Vern Smith.

## ORDER

ROSENBLATT, District Judge.

### I. BACKGROUND

On May 9, 1994, Joseph Gingeleskie ("Gingeleskie") traveled from his home in New Jersey to Phoenix, Arizona, in order to attend a national sales meeting offered by his employer, Bristol–Myers Clairol. Gingeleskie stayed at Defendant Arizona Biltmore Hotel ("Hotel"). Gingeleskie participated in several pre-seminar activities with co-employees, including attending an early-bird reception, playing in several outdoor basketball games, and attending an early evening cocktail party. Gingeleskie called home to New Jersey at approximately 4:42 p.m.; Gingeleskie did not tell his children he was feeling ill, nor did his children detect that Gingeleskie was ill.

Gingeleskie left the cocktail party [1], which was scheduled from 5:00 p.m. to 5:45 p.m., and approached the front desk of the Hotel. Gingeleskie had the following conversation with Suzanne Malcolm, a member of the Hotel staff:

Q. And Mr. Gingeleskie approached the front desk?

A. Yes, he did.

Q. And can you tell us what happened?

A. When he approached the front desk, he asked me if there was a medical facility on the property. I told him no, there was not, and I asked if he was all right. He replied that he did not feel well. I then told him there was a medical walk-in, as well as an emergency room close by, that ExecuCar would take him there if he would like. He seemed to consider that for a moment, decided to go to the emergency room.

See Deposition of Suzanne Malcolm, pg. 26, Appendix M in support of Westin Hotel's Motion for Summary Judgment.

Ms. Malcolm then summoned a bellman, Joe Thomas, to direct Gingeleskie to the front door, where an ExecuCar limousine was waiting. As Gingeleskie approached the front door, Justin Stark, the Hotel's Manager of Guest Services, greeted Gingeleskie and asked him how he was. Gingeleskie replied that he was "not feeling too well". Stark said he was sorry to hear that. Stark did not notice anything unusual about Gingeleskie's appearance.

A. None whatsoever, no. I don't recall noting anything.

Q. Nothing stood out in your mind?

A. No.

See Westin's Statement of Facts in support of their Motion for Summary Judgment, Appendix P.

---

1. Paul Rubsam, a colleague of Gingeleskie's, played basketball with Gingeleskie and later spoke to him at the cocktail party. Rubsam stated in his deposition:

 Q. Did you notice any physical characteristics about him [Gingeleskie] that cause you concern for his health?

Gingeleskie then entered a limousine owned by Defendant ExecuCar and driven by Defendant Vern Smith ("Smith"). Thomas asked Smith to take Gingeleskie to Healthwest Regional Medical Center, now known as Columbia Medical Center. According to Smith's log, the trip began at 5:35 p.m. Smith greeted Gingeleskie and, not noticing anything wrong with Gingeleskie, asked him if he was picking someone up at the hospital. Gingeleskie responded by stating that he was "not feeling well." During the majority of the trip to the hospital, Smith contends that Gingeleskie appeared fine.

Smith drove west on Missouri Avenue to 20th Street, then south on 20th Street to Highland. Smith then drove east and entered the Squaw Peak freeway. While stopped at a traffic light before entering the Squaw Peak, Gingeleskie asked Smith how much longer it would take. Smith said it would take another 4–6 minutes to get through the light. Gingeleskie said nothing further.

After entering the Squaw Peak, Smith exited at the Thomas Road exit. The trip took approximately two minutes. Just before turning onto the off-ramp, Smith heard Gingeleskie moan and fall over in the back seat. Smith then sped the remainder of the distance to the hospital, one block away. Smith ran a red light and flashed his lights in order to avoid any delays in getting Gingeleskie to the hospital.

Upon arriving at the hospital, Smith rushed inside and informed staff that he had a passenger in need of medical assistance. Hospital staff came out to the limousine and took Gingeleskie into the hospital. At 5:48 p.m., hospital staff began administering CPR. Medical treatment continued until 6:11 p.m., when Gingeleskie was pronounced dead. The hospital informed the Hotel of Gingeleskie's death at 6:40 p.m. The autopsy report concluded that Gingeleskie died of a sudden heart attack. The report also revealed that

Gingeleskie's right coronary artery was 95% occluded, his left anterior descending branch was 90% occluded and his left circumflex artery was 80% occluded. No one—including Gingeleskie's family and physicians—knew of Gingeleskie's serious heart disease.

Upon learning that Gingeleskie had died, the Hotel security staff filed a routine incident report. The security staff interviewed several people, including Ms. Malcolm. When interviewed, Ms. Malcolm stated that Gingeleskie may have been pale, and that he had some sweat on his forehead. Outside of these observations, Gingeleskie appeared normal and in no distress.

Gingeleskie's widow (hereinafter "Plaintiff"), individually and as executrix of Gingeleskie's estate, brought an action in the Morris County Superior Court in the State of New Jersey. That action was removed by Defendant Hotel. Thereafter, the parties agreed to transfer the matter to this Court.

Plaintiff filed an amended complaint on May 17, 1995, naming Hotel, Supershuttle of Arizona[2], and Vern Smith[3] and his wife as Defendants. Plaintiff asserts claims for wrongful death, expenses[4] and loss of consortium.

On May 31, 1996, Defendants Supershuttle and Smith filed a Motion for Summary Judgment; Plaintiff filed a Motion for Partial Summary Judgment; and Defendant Hotel filed a Motion for Summary Judgment. All three motions were fully briefed and oral arguments were heard on the motions on December 2, 1996.

## II. DISCUSSION

### A. Standard

Summary judgment may be granted if the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of

2. Supershuttle does business as ExecuCar.

3. Vern Smith was named individually and as a sole proprietor.

4. Count Two states that as a result of the alleged negligence of the Defendants, Gingeleskie suffered pain and suffering, and was deprived of income, earning and the enjoyment of life's pleasures, and incurred medical expenses and funeral expenses. Although labeled as a separate count, this seems to be a statement of damages.

law." Rule 56(c), Federal Rules of Civil Procedure.

Summary judgment is proper if the nonmoving party fails to make a showing sufficient to establish the existence of an essential element of his case on which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The disputed fact(s) must be material. *Id.*

Substantive law determines which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Moreover, the dispute must be genuine. A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. In a civil case, the issue is:

> whether a fair-minded jury could return a verdict for the Plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the Plaintiff.

*Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

The opposing evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 242, 106 S.Ct. at 2510; *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir. 1983).

*B. Applicable law*

■ The first issue which must be addressed is the applicable law in this matter. This matter was transferred to the District of Arizona from the District of New Jersey pursuant to 28 U.S.C. § 1404(a). This Court must therefore apply the choice-of-law provisions of the transferor court, i.e. the choice-of-law provisions of New Jersey. *See Newton v. Thomason,* 22 F.3d 1455, 1459 (9th Cir.1994).

■ Under New Jersey law, choice-of-law questions in relation to tort actions are analyzed under the governmental interest approach.

> This approach requires a two-step analysis in resolving conflicts questions: the court determines first the governmental policies evidenced by the laws of each related jurisdiction and second the factual contacts of the parties with each related jurisdiction.

*Deemer v. Silk City Textile Machinery Co.,* 193 N.J.Super. 643, 649, 475 A.2d 648, 650 (N.J.Super.App.Div.1984).

> This analysis does not count up the factual contacts with the respective states . . . and make a quantitative determination of which state law should apply. Instead, "the qualitative nature of contacts is considered so that only contacts which are likely to promote valid state policies are considered relevant."

*Pine v. Eli Lilly & Company,* 201 N.J.Super. 186, 192, 492 A.2d 1079, 1082 (N.J.Super.App.Div.1985) (quoting *Henry v. Richardson–Merrell, Inc.,* 508 F.2d 28, 32 (3d Cir.1975)).

■ However, a conflict must exist prior to applying New Jersey's conflict of law provisions. New Jersey and Arizona both follow the Restatement (Second) of Torts in relation to the creation of duties, which is the only issue before this Court on the motions.[5] Thus, because there is no conflict, this Court

---

5. There may be conflicts between New Jersey and Arizona law with respect to liability, but that issue is not before the Court currently.

> [C]onflict of laws principles do not require that all legal issues presented by a single case be decided under the law of a single state. Instead, choice of law decisions can and should be made on an issue-by-issue basis, and thus

the law of different states can apply to different issues in the same case. . . . It [a court] should rule only as to issues appropriately identified by the moving party, or should not rule at all.

*O'Connor v. Busch Gardens,* 255 N.J.Super. 545, 547–48, 605 A.2d 773, 774 (N.J.Super.App.Div.1992).

need not undertake a conflicts analysis. This Court, sitting as the transferee court, will look to New Jersey case law in interpreting the provisions of the Restatement (Second) of Torts.

It appears that Plaintiff believes that Arizona law applies in this case.[6] However, even applying the actual conflict-of-law principles stated under New Jersey law, New Jersey substantive law is applicable.

■ New Jersey law favors "applying New Jersey law in tort actions when the plaintiff is domiciled in New Jersey." *Pine v. Eli Lilly & Company*, 201 N.J.Super. 186, 193, 492 A.2d 1079, 1083 (N.J.Super.App.Div.1985). In the *Pine* case, Pine lived in New York and the defendants were pharmaceutical companies doing business in New Jersey. Pine underwent surgery in New York for testicular cancer, which had resulted from an injection of the drug Diethylstibestrol (DES) into Pine's mother during her pregnancy with Pine. New York did not have a "discovery rule" which would have allowed Pine to bring an action against the drug companies for the injection of the drug some 26 years earlier. However, New Jersey did have such a discovery rule, under which the statute of limitations did not begin to run until the discovery of the ailment. Pine then moved to New Jersey and filed suit against the pharmaceutical companies.

The New Jersey court, assuming Pine was a proper New Jersey domiciliary, found that New Jersey law applied because of the interest of New Jersey in providing compensation for its citizens who have been injured. That court noted that although all factual contacts in the action, i.e. where the cancer was diagnosed, where the drug was injected, all pointed to New York, these factual contacts did not override New Jersey's strong interest in protecting its domiciliaries. *Id.*

■ The same could be said for this case. Although all of the relevant factual contacts are with the State of Arizona, i.e. the situs of the injury, where the death occurred, where the alleged negligence occurred, these factors would not outweigh New Jersey's interest in protecting its domiciliary. The only interests Plaintiff lists as belonging to Arizona is the regulation of hotels and public transportation, tourism and the protection of foreign domiciliaries while visiting. *See* Reply Addressing Westin's Response, pp. 2–3. Although Plaintiff would like this Court to count contacts, it is the quality, not the quantity, of contacts which determines the application of substantive law. Arizona's interests are not qualitatively superior to that of New Jersey, i.e. protection of its domiciliaries. Therefore, because there is no conflict, and because New Jersey has the most relevant governmental interests in having its substantive law apply, the Court will apply the law of New Jersey in this matter.

### C. Plaintiff's motion

All of the issues contained in the three motions for summary judgment are the same: whether Defendants had a duty to Gingeleskie, which in turn would result in liability. Plaintiff concedes that if Defendants did not owe a duty to Gingeleskie, they are not liable even if they were negligent. *See* Plaintiff's Motion for Partial Summary Judgment ("PMPSJ"), pg. 4. Because Plaintiff's motion goes to all Defendants, the Court will address this motion first, and then supplement the discussion with any additional arguments made in the two remaining motions.

Plaintiff contends that Defendants breached their duty of reasonable medical transport as defined in § 323 of the Restatement (Second) of Torts, and also breached the duty of a common carrier. Additionally, Plaintiff claims that Defendants violated their own employment protocols and standards.

#### 1. Section 323

##### a. Duty

■ Plaintiff's first contention is that Defendants breached a duty of medical transport under § 323 of the Restatement (Second) of Torts. This section states:

---

6. Of course, Plaintiff's belief is based upon the erroneous assumption that the place of the tort, i.e. lex loci, controls the determination of which jurisdiction's law applies. Neither Arizona nor New Jersey subscribes to this method of conflicts analysis any longer.

§ 323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Plaintiff claims that because Hotel called a cab instead of an ambulance or having Hotel security evaluate Gingeleskie, it assumed the duty of reasonable medical transport because such action increased the risk of Gingeleskie's condition worsening prior to arrival at the hospital. As to Defendant Smith, Plaintiff claims he assumed this duty because he knew Gingeleskie to be ill and that Gingeleskie wanted to go to the hospital; therefore his failure to get him to the hospital in the same condition as when he climbed into the limousine shows that the risk of harm to Gingeleskie had increased.

Hotel contends that § 323 is only applicable to those who do not have a duty to act. Because Hotel has a duty as an innkeeper pursuant to Restatement (Second) of Torts § 314A, it cannot also be subject to the increased duties present in § 323. Additionally, Hotel contends that even if it did have a duty under § 323, it would be immune from suit based upon New Jersey's Good Samaritan statute.

ExecuCar and Smith respond by claiming they had no legal duty under § 323 and if they did they would be immune under the Good Samaritan statute.

■ From what little caselaw there is in relation to the issue of duty under § 323, it is clear that this duty only arises in the absence of any other duty to act.

That doctrine [under § 323 of the Restatement (Second) of Torts] provides that one who renders services for another or for a

third person, *in the absence of a duty otherwise to act*, may be liable for his failure to exercise reasonable care, where such failure increases the risk of harm to the other party, where reliance is placed upon the actor's undertaking, or where the actor performs a duty owed by the other to the third person.

*Wells v. U.S.*, 655 F.Supp. 715, 719 (D.D.C. 1987) (emphasis added); *see also Barnum v. Rural Fire Protection Company*, 24 Ariz. App. 233, 237, 537 P.2d 618, 622 (Ariz.App. 1975) ("[Section 323] is, plainly, a rule which comes into play by reason of an affirmative undertaking by one who, under the circumstances, has no duty to act.").

Here, it is clear that both Hotel and ExecuCar had duties to act, i.e. those duties contained in § 314A of the Restatement. Apparently Plaintiff wants to take the analysis one step further and state that after they completed their duty under § 314A[7], they then undertook additional duties under § 323 because they assumed a duty of medical transport by offering to take Gingeleskie to the hospital.

■ There is no case law to support this contention of Plaintiff. The use of the "loss of chance doctrine", which Plaintiff contends in this matter, is used by the courts in order to allow a plaintiff with a preexisting condition to nonetheless recover in light of another's negligence, usually in the context of medical malpractice. The theory forms the necessary *causation* to allow recovery under a tort theory; however, prior to getting to causation, there must be a *duty*. Therefore, in applying § 323 to this case, it could only come into play if Defendants breached a duty they owed Gingeleskie, i.e. the duty under § 314A; then Plaintiff could use § 323 to show causation, i.e. loss of chance to survive, based upon the breach of that duty.

### b. Immunity

Before the Court addresses whether or not there was a breach of duty under § 314A, the Court will address an argument put forth by Defendants. Defendants contend the New

---

7. There is a dispute as to whether or not Hotel and ExecuCar breached their duties under

§ 314A. The Court will undertake that analysis *infra.*

Jersey and Arizona "Good Samaritan" statutes provide immunity for any actions which violated any duty under § 323. If § 323 did provide for an independent duty, Defendants would be correct that the Good Samaritan statutes provide immunity. As the Court has explained *supra,* however, in the context of this case § 323 does not create an independent duty; it only provides a standard for causation.

 The Good Samaritan statutes do *not* apply to any duty created under § 314A. "[T]he Good Samaritan Act does not apply to those ... who have a preexisting duty to act...." *Praet v. Borough of Sayreville,* 218 N.J.Super. 218, 225, 527 A.2d 486, 489–90 (N.J.Super.App.Div.1987). Therefore, because both Hotel and ExecuCar have a preexisting duty under § 314A, the Good Samaritan statutes do not apply in this analysis.

### 2. Section 314A; higher duty of care

The next step is to determine whether or not Defendants breached their recognized duty under § 314A of the Restatement. Plaintiff also contends that common carriers have a higher standard of care. Because ExecuCar is a common carrier, and because Hotel placed Gingeleskie into an ExecuCar limousine, Plaintiff claims all Defendants are subject to this higher standard of care.

 Section 314A of the Restatement (Second) of Torts states, in relevant part:

(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

(2) An innkeeper is under a similar duty to his guests.

 The New Jersey courts have defined the duty of a common carrier[8] in the following ways:

---

8. Hotel concedes that its duty under § 314A is the same as ExecuCar's duty as a common carri-

[A] carrier's 'legal duty of care for the passenger's safety simply means care commensurate with the risk of harm * * * such as one exercising a high degree of care for a passenger's safety 'would under all the circumstances deem prudent to obviate the danger, known or reasonably to be anticipated.'"

*Melicharek v. Hill Bus Company,* 70 N.J.Super. 150, 153–54, 175 A.2d 238, 240 (N.J.Super.App.Div.1961) (citing *Harpell v. Public Service Coordinated Transport,* 20 N.J. 309, 316, 120 A.2d 43, 46 (N.J.1956)).

Although New Jersey has no statutory provision mandating that common carriers use a "high duty of care," as many other states do, our courts have consistently imposed that standard. *See Ricci v. American Airlines,* 226 N.J.Super. 377, 544 A.2d 428 (App.Div.1988) (noting that the duty to protect patrons is high); *Melicharek v. Hill Bus Co.,* 70 N.J.Super. 150, 175 A.2d 238 (App.Div.1961) (stating that if carrier has reasonable cause to know of likelihood of injury to a passenger and danger is preventable by exercise of due care, carrier is liable); *Sandler v. Hudson & Manhattan R.R. Co.,* 8 N.J.Misc. 537, 151 A. 99 aff'd, 108 N.J.L. 203, 156 A. 459 (E. & A.1931) (holding carrier liable when one passenger pushed another between the train and platform because carrier had duty to protect against known dangers); *Exton v. Central R.R. Co.,* 62 N.J.L. 7, 42 A. 486 (Sup.Ct.1898) aff'd. o.b., 63 N.J.L. 356, 46 A. 1099 (E. & A. 1899) (finding carrier liable because of knowledge of criminal propensities of men loitering around station).

*Lieberman v. Port Authority of New York and New Jersey,* 132 N.J. 76, 85, 622 A.2d 1295, 1299–1300 (N.J.1993).

Therefore, the common carrier must exercise a high duty of care; however, that duty is commensurate with the risk of harm which is known or reasonably to be anticipated by the carrier. The Restatement (Second) of Torts provides comments to § 314A which are relevant to the analysis in this matter:

er.

*e.* The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury. He is not required to take precautions against a sudden attack from a third person which he has no reason to anticipate, or to give aid to one whom he has no reason to know to be ill. He is not required to take any action where the risk does not appear to be an unreasonable one, as where a passenger appears to be merely carsick, and likely to recover shortly without aid.

*f.* The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained. He is not required to give any aid to one who is in the hands of apparently competent persons who have taken charge of him, or whose friends are present and apparently in a position to give him all necessary assistance.

▬▬▬ Based upon the fact in the record before this Court, as well as the standard for the duty under section 314A, it appears that both ExecuCar and Hotel are entitled to summary judgment on this issue. Both Hotel and ExecuCar provided reasonable services to Gingeleskie in light of his known condition, i.e. "feeling ill". Both parties took reasonable steps to protect Gingeleskie and both took reasonable steps to place Gingeleskie into the hands of someone competent to assist him, i.e. doctors at the hospital.

Of course, all of this talk of "reasonableness" lends to a finding that this issue must go to a jury to be decided. However, Plaintiff's position as to how these Defendants should have responded is clearly unreasonable and beyond the duty placed upon them

by the Restatement (Second). Plaintiff states that

> [t]he problem arose when the minimally trained, low paid staff person made wrong assumptions, and failed:
>
> to ask more questions;
>
> failed (sic) to follow the manual regarding requests for medical assistance;
>
> failed (sic) to call her supervisor;
>
> failed (sic) to call security;
>
> failed (sic) to call 911;
>
> an ambulance; or
>
> an EMT or other immediate medical attention.

*See* Plaintiff's Reply in support of Motion for Partial Summary Judgment, pg. 4. According to Plaintiff, Hotel should have had better trained staff, higher paid staff, and staff who, in light of Gingeleskie's appearance and ability to ask for assistance and choose between options presented, should have taken it upon themselves to decide that this was an emergency and to take the appropriate actions. This is unreasonable given Gingeleskie's appearance and apparent ability to think for himself and move without assistance.

Defendants cite cases which are very persuasive on this issue. For instance, in *Applebaum v. Nemon,* 678 S.W.2d 533 (Tx.App. 1984), a Texas court held that although a day care center had a duty under section 314A of the Restatement to the children it cared for, it did not have a duty to have personnel trained in CPR or other type of life saving aid. The court stated: "We hold that while appellants had a duty to render assistance to Howard Nemon, they had no duty to provide life-saving aid to Howard Nemon which requires special training to acquire." *Id.* at 537. Under this case, Hotel and ExecuCar had no duty under section 314A to have personnel trained in life-saving techniques.

In *Duda v. Gaines* 12 N.J.Super. 326, 79 A.2d 695 (N.J.Super.App.Div.1951), the Superior Court of New Jersey, Appellate Division, held that plaintiff, a student injured while playing football, could not recover on a tort theory against the school after teachers sent the boy home. The boy appeared to be fine; was waking and talking; and the teachers assumed there was no medical emergency

which would prevent the boy's parents from deciding whether to seek medical aid. The New Jersey court stated:

> It is clear that this evidence and the inferences which may legitimately be drawn therefrom in no wise could support a finding of an immediate pressing necessity for medical aid for the boy before he went home and that the decision whether to obtain such aid could not await his parents' consideration. He was suffering pain from the injury but was fully possessed of his faculties, was able to walk unattended the 125 yards from the field to the clubhouse and after changing his clothes to walk home. In these circumstances the fact do not reasonably permit opposing conclusions by fair-minded men as to whether or not the boy was then in urgent need of medical attention.

*Id.* at 329, 79 A.2d at 696. Although this case was decided in 1951, there is no reason to believe that the logic behind it—that a person fully able to communicate and walk under his own volition—should impose upon third parties a duty to determine that a medical emergency is present.

Finally, the *Southern Pac. Co. v. Buntin,* 54 Ariz. 180, 94 P.2d 639 (Ariz.1939) case provides guidance on this issue. The Arizona Supreme Court held that a railroad, as a common carrier, did not have a duty to a passenger who had poor eyesight and who was injured on the platform due to the lighting which was insufficient for this particular plaintiff to see in. That court stated:

> If the carrier knows the passenger to be abnormal, either physically or mentally, it is then bound to give such higher degree of care for the safety of that person as his infirmity requires, and a failure to do so is negligence, even if the conduct of the carrier would not be negligence towards the normal person.... But if the carrier does not know of the abnormality, it owes no more care to the abnormal than it would to a normal passenger, and it is under no duty of making an investigation to determine the condition of the passenger.

*Id.* at 185–86, 94 P.2d at 641.

Here, although Defendants were aware that Gingeleskie was ill, they knew nothing more than what they could see. Gingeleskie did not indicate that he was anything more than merely sick. Gingeleskie was able to ask for a medical facility and choose between a walk-in facility and a hospital. Gingeleskie was able to approach the front desk under his own volition, as well as walk to the cab by himself. The only outward signs of illness was pale skin and "sweating". These facts should not impose a duty upon Defendants to ascertain that Gingeleskie was having a heart attack, or that a serious medical emergency was at hand.

Plaintiff claims that because Gingeleskie asked to go to the hospital, this request alone should have alerted Defendants that a serious medical emergency was occurring. However, this is not the standard by which this Court must decide the issue. The standard under section 314A is whether Defendants gave Gingeleskie "first aid after [they] know[ ] or ha[ve] reason to know that [he][was] ill or injured." *See* Section 314A. Given the circumstances, Defendants rendered the only aid which appeared to be reasonable; to accommodate Gingeleskie's request and transport him to the hospital.

Therefore, based upon the facts in this case and the sparse case law on the issue, the Court finds that Defendants only owed a duty to Gingeleskie under section 314A of the Restatement (Second) of Torts, and that they did not violate that duty. Because the Court has found that Defendants did not breach their duty. it will not discuss Plaintiff's claims regarding the increased risk of harm, etc. in relation to the damages issue.

### 3. Employment protocols and standards

The final issue to be addressed is whether Defendants' internal policies and procedures somehow created a duty to Gingeleskie. Plaintiff contends that Hotel had policies which required the front desk clerk to call security when Gingeleskie asked to be transported to the hospital, and that her failure to follow these procedures breached a duty owed to Gingeleskie. Plaintiff also claims that because Defendant Smith did not deliver Gingeleskie to the hospital alive, thereby allowing Smith to collect a fare and tip from him, Smith violated a "policy" between him

and ExecuCar, which somehow also creates a duty toward Gingeleskie.

Hotel claims that its internal emergency procedures do not create a duty of care with respect to Gingeleskie. ExecuCar and Smith claim that the employment terms between Smith and ExecuCar do not create a duty as to Gingeleskie.

The case relied upon heavily by Plaintiff, *Leikvold v. Valley View Community Hospital*, 141 Ariz. 544, 688 P.2d 170 (Ariz.1984), is not applicable in this case. The issue in *Leikvold* was whether representations contained in an employee manual constituted a valid employment contract between the employee and the employer. This is hardly the issue presented in this case. There is not one shred of evidence that Gingeleskie was ever aware of any internal policies or procedures of either Hotel or ExecuCar. Certainly, under any theory of third party beneficiary status, Gingeleskie cannot win. There is no knowledge of the policies, let alone any reliance upon the policies.

Other cases which are closer on point than *Leikvold* hold against any theory or recover for Plaintiff. In *Newsome v. Cservak*, 130 A.D.2d 637, 515 N.Y.S.2d 564 (N.Y.App.Div. 1987), the New York Supreme Court held that the defendant's internal policy of sanding and salting the entrance to the parking lot and roads of the mall did not create any basis for liability of the defendant to plaintiff. The court stated: "This argument is meritless since there is no basis for the proposition that a party may be held liable for failing to follow a policy which it has adopted voluntarily, and without legal obligation, especially when there is no showing of detrimental reliance by the plaintiffs on the defendants following that policy." *Id.* at 638, 515 N.Y.S.2d at 566.

The Tenth Circuit has held that although internal policies of a defendant may be introduced into evidence to show negligence, such policies do not alter the applicable standard of care. *Robinson v. Missouri Pacific Railroad Co.*, 16 F.3d 1083, 1091 (10th Cir.1994). Therefore, at best, the policies in question [9] would only be admissible to show the mea-

sure of caution Hotel ought to have used. These policies do not change the duty owed to Gingeleskie, nor do they create a duty independent of that which Hotel owed to Gingeleskie under section 314A. Because the Court has already discussed that Hotel and ExecuCar have not violated their duties under § 314A, the evidence related to the alleged violation of internal policies would not even come into play.

Therefore, there is no argument that Hotel's or ExecuCar's internal policies created any duty which was owed to Gingeleskie. Therefore, the Court finds this contention of Plaintiff to be without merit.

### D. Conclusion

Defendants had a duty to Gingeleskie—that stated in Section 314A of the Restatement (Second) of Torts. The actions taken by Defendants in light of the undisputed facts presented to this Court, i.e. Gingeleskie asking for a medical facility, choosing between options given to him by the front desk clerk, walking under his own volition, no outward appearance of distress, etc., did not breach to the duty Defendants had to Gingeleskie.

Section 323 of the Restatement (Second) of Torts does not create an additional, independent duty owed to Gingeleskie by Defendants. Had Defendants breached their duty to Gingeleskie under section 314A, section 323 could have been introduced to show causation, i.e. that the breach of the duty caused the injury suffered by Gingeleskie. However, because there was no breach of duty, section 323 does not come into play.

Finally, the internal procedures and policies of the Defendants did not create an independent duty owed to Gingeleskie. There is no evidence Gingeleskie knew of these policies or relied to his detriment upon these policies. Additionally, these policies do not alter the standard of care owed to Gingeleskie under section 314A. Because Defendants did not breach their duty to Gingeleskie, any alleged failure to follow internal

---

**9.** It should be noted that the only written policies in question are those of Hotel; there are no written policies in relation to ExecuCar and Smith.

policies does not create a new and independent duty to act.

In accordance with the foregoing,

IT IS ORDERED granting Defendants Smith and ExecuCar's Motion for Summary Judgment [Doc. # 69].

FURTHER ORDERED denying Plaintiff's Motion for Partial Summary Judgment [Doc. # 71].

FURTHER ORDERED granting Defendant Westin's Motion for Summary Judgment [Doc. # 74].

FURTHER ORDERED dismissing Plaintiff's complaint and cause of action. The Clerk of the Court is directed to enter judgment accordingly.

FURTHER ORDERED denying Plaintiff's Motion for Leave to Substitute Expert Witness [Doc. # 92] as moot.

FURTHER ORDERED denying Defendant's Motion for Leave to File Reply [Doc. # 98] as moot.