ALBERT E. HARPELL, PLAINTIFF-RESPONDENT, v. PUB-
LIC SERVICE COORDINATED TRANSPORT, DEFEND-
ANT-APPELLANT.

Argued December 5, 12, 1955—Decided January 9, 1956.

*Mr. Luke A. Kiernan, Jr.,* argued the cause for appellant.

*Mr. Thomas F. Hueston* argued the cause for respondent (*Mr. Robert T. Hueston,* on the brief).

The opinion of the court was delivered by

HEHER, J. Plaintiff was awarded damages for personal injuries sustained while a passenger on an electric trolley car operated by the defendant common carrier on its line extending between the Market Street station of the Pennsylvania Railroad and Franklin Avenue, in Newark, New Jersey. The Appellate Division of the Superior Court affirmed the judgment, 35 *N. J. Super.* 354 (*App. Div.*

1955) ; and we certified the case here on defendant's petition. 19 *N. J.* 327 (1955).

In the late afternoon of February 6, 1953, as the trolley car proceeded along the carrier's private right of way leased from the City of Newark, toward an overpass for passengers at the Park Avenue station, not far from where the underground line commonly known as the "City Subway" comes to the surface and continues at ground level, on the bed of the old Morris Canal, a "jagged piece of concrete and pebble mixture," of baseball size, thrown by a 15-year-old boy from a point beyond a fence bordering the rights of way through a window on the left side of the trolley, struck plaintiff, there seated, and inflicted head and facial wounds which included the loss of his left eye. There was evidence that the trolley windows were equipped with outside metal screens, extending halfway up from the sill, to protect protruding arms of passengers. The missile came through the window above the screen, shattering the ordinary glass of which it was made.

The defendant carrier's answers to interrogatories revealed prior knowledge of 17 somewhat similar occurrences along this route during the five years preceding the particular misadventure, five of these during the immediately preceding year. Evidence was adduced from the carrier's supervisor that he had received reports of such happenings on an average of one a month. And it was shown that there were three such in January 1953, the month prior to plaintiff's injury; and that the carrier had from time to time informed the local police of the lawless acts, and patrolmen had been specially assigned to the troubled area by an emergency order made January 15, 1953.

The operator of the trolley testified that there was "nothing unusual about" the "throwing of rocks * * * in this same vicinity"; that was true of the whole period of his employment on that line; "When the kids come out of school they usually throw rocks"; "Sometimes near the rush hour or in the morning"; "not every other day"; "Every other day, sometimes"; "Somewhere in this vicinity." As the car

approached Park Avenue, he observed three boys "up on the street there," one "maybe 15, and the others were seven and ten – – – somewhere in there"; "The big fellow held a rock"; "I waved to him not to throw it"; "I kept on going, and all of a sudden I heard something like a noise, but I thought it was a circuit breaker in the trolley"; "He was standing ready to throw a rock and I waved to him and figured maybe he wouldn't throw it"; "I figured maybe I would scare him a little"; "He was standing up like this with the rock in his hand and I waved to him figuring maybe he wouldn't but he did." The witness explained his failure to stop the car: "I figured that by the time he threw it he would miss the car because the speed and the throw would be different." "Q. You mean you figured you would take a chance? A. I wouldn't take a chance on that. Q. But you did take a chance? A. No. I figured he might hit the fence because I didn't expect him to throw that far." And then he testified otherwise: "Q. Why couldn't you stop your trolley? A. I can't give no answer. Q. You knew that the boys almost every other day had during the morning or rush hours at night been throwing rocks and you felt this boy was going to throw a rock. Why didn't you stop your trolley? A. I couldn't answer that." Park Avenue "is a regular station," the witness said; it is "partially underground; it's like in a gulley, partly."

Apropos of the carrier's contention that there was no showing of a departure from "customary standards of construction and equipment germane to considerations of safety," Judge Conford, for the Appellate Division, said "the question of standards is irrelevant since the hazard involved did not arise from defendant's management of its own facilities and had no relation to those safety factors or considerations which are ordinarily taken into account in planning or installing trolley equipment," but "Apart from the matter of protective devices," "there is an open question as to whether the failure of the motorman to warn his passengers of the danger, or to stop, alight and admonish the juvenile, when he saw him in an attitude plainly portending the projection

of a dangerous missile at the vehicle in his charge, did not constitute a default in that duty imputable to defendant," and the "assessment of the reasonableness of his behavior and the consequent resolution of that question was for the jury, not the court." Invoking the doctrine of *Rourke v. Hershock*, 3 *N. J.* 422 (1950), it was found that "while the asserted negligence of the defendant with respect to any one of the several elements charged by the plaintiff here to constitute want of the required duty of care might not have been sufficient, in and of itself, we conclude that the combined factual background of this accident made for a jury question."

The carrier's thesis *in limine* is that the "charge of negligence related solely to" its "equipment" on the trolley car, and so it is entitled to judgment as a matter of law "when the undisputed proofs clearly demonstrated that the sole cause of the accident and the plaintiff's injury was the vicious act of a boy 15 years of age, hurling a jagged piece of concrete through the window of the trolley car from a point beyond a cyclone-type fence bordering the right of way"; and, moreover, there was no proof that "certain mechanical appliances could or should have been used by defendant on its trolley car, in the exercise of the required degree of care, and that it failed to use known mechanical devices in common use to prevent such accidents," and, absent such proof, "there would be a complete lack of evidence" tending to show the violation of a duty owing by the carrier to plaintiff.

The reasoning derives from what is conceived to be the basic issue framed by the pretrial order—*i. e.*, that "similar" missile-throwing "incidents" had occurred on earlier occasions, to the carrier's knowledge, and the carrier "did not use mechanical appliances *for* precaution to prevent further injuries to their passengers." We are told that this signifies a "charge of negligence * * * not predicated on any negligent act or omission" of the carrier's car operator. But it is fairly deducible from the context that here, by a clerical or typographical error, the preposition "for" was used when the disjunctive conjunction "or" was intended. Such, it

would seem, was the understanding of the parties at the trial. The complaint was not so limited in its allegations of duty and breach, and the pretrial order declares the parties' reliance upon their pleadings and interrogatories, save that the three separate defenses were withdrawn. The point was not made at the trial; plaintiff's opening to the jury was in keeping with the averments of the complaint, and such were the issues tried; the carrier's opening denied negligence in the "operation" of the trolley car, and it was conceded the doctrine of *res ipsa loquitur* applied. See *R. R.* 4:15–2. And the carrier's brief in the Appellate Division made the same concession. The plaintiff, on his own case, proved only the occurrence of the injury: "I seemed to hear a tinkle of glass and I felt some sort of an explosion or shattering at my head and I fell forward and blood gushed from my head."

The basic issue submitted to the jury by Judge Ewart concerned the carrier's "duty and obligation to its passengers, including the plaintiff, to take all reasonable measures designed to protect its passengers against all known hazards or dangers, or all dangers that might reasonably be anticipated," and the sufficiency of the evidence to establish whether the carrier "did take precautionary measures which a reasonably prudent person would have taken under the circumstances of this case for the protection of its passengers."

Conceding that proof of "prior occurrences" is admissible to charge the defendant with "knowledge of an existing condition" constituting a reasonably foreseeable danger, it is yet insisted that the rule has relation to a "condition over which defendant had complete control of the facilities or property which were in an unsafe or defective condition," citing a line of cases beginning with *Alcott v. Public Service Corporation,* 78 *N. J. L.* 482 (*E. & A.* 1909), and the "ability of the carrier not only to foresee the occurrence *but more importantly that the carrier is in a position to guard against such occurrence,*" and the "latter aspect of the rule necessarily presupposes control by the carrier over the person likely to cause the injury or over the facilities, property or

equipment from which the occurrence emanates." It is said in argument that the standard of reasonable foresight for harm has reference to the carrier's "control over the condition itself which caused the injury or over the person whose act, intentional or otherwise, caused the accident," citing New Jersey cases commencing with *Hansen v. North Jersey St. Ry. Co.*, 64 *N. J. L.* 686 (*E. & A.* 1900), and including *Kinsey v. Hudson & Manhattan R. Co.*, 130 *N. J. L.* 285 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 161 (*E. & A.* 1944), and cases in other jurisdictions.

 But the rule of reasonable foresight for harm has no such limitation. As said in the *Kinsey* case, the traditional concept of the carrier's legal duty of care for the passenger's safety simply means care commensurate with the risk of harm – – – such as one exercising a high degree of care for the passenger's safety "would under all the circumstances deem prudent to obviate the danger, known or reasonably to be anticipated," and the resolution of that inquiry was peculiarly the province of the jury in the complex of circumstances here presented. The question is whether the wrongful act of the third person could have been reasonably anticipated. See also *Exton v. Central R. Co. of N. J.*, 62 *N. J. L.* 7 (*Sup. Ct.* 1898); *Sibley v. City Service Transit Co.*, 2 *N. J.* 458 (1949); *Hughes v. Atlantic City, etc., R. Co.*, 85 *N. J. L.* 212 (*E. & A.* 1914); *Whalen v. Consolidated Traction Co.*, 61 *N. J. L.* 606 (*E. & A.* 1898).

 Negligence is a matter of risk * * * that is to say, of "recognizable danger of injury. It has been defined as 'conduct which involves an unreasonably great risk of causing damage,' or, more fully, conduct 'which falls below the standard established by law for the protection of others against unreasonably great risk of harm' "; the "amount of care demanded by the standard of reasonable conduct must be in proportion to the apparent risk"; "As the danger becomes greater, the actor is required to exercise caution commensurate with it"; "Carriers who accept passengers entrusted to their care must use great caution to protect them, which has been described as 'the utmost caution

characteristic of very careful prudent men,' or 'the highest possible care consistent with the nature of the undertaking,' " and this may include the relational duty to exercise control of the conduct of third persons. *Prosser, Law of Torts* (*2d ed.* 1955), 119, 147, 188. The cases cited as exemplifying the principle include our own *Kinsey v. Hudson & Manhattan R. Co., supra.* See *Spalt v. Eaton,* 118 *N. J. L.* 327 (*Sup. Ct.* 1937), affirmed 119 *N. J. L.* 343 (*E. & A.* 1938); *Pennsylvania Co. v. Roy,* 102 *U. S.* 451, 26 *L. Ed.* 141 (1880); *Carson v. Boston Elevated Ry.,* 309 *Mass.* 32, 33 *N. E. 2d* 701 (*Sup. Jud. Ct.* 1941); *Restatement, Torts,* sec. 282; also Professor Seavey's treatises, *Negligence-Subjective or Objective,* 41 *Harv. L. Rev.* 1 (1927), and *Principles of Torts,* 56 *Harv. L. Rev.* 72 (1942).

The defendant carrier could not absolve itself of the duty of care to its passengers, commensurate with the known increasing danger, by reporting to the local police the notorious repetitive acts of violence directly menacing passengers' security. And while one acting in a sudden emergency may be left no time for thought, and so cannot weigh alternative courses of action, but must make a speedy decision, which will be based very largely upon impulse or instinct, the conduct required is still that which is reasonable under the circumstances; his own judgment or impulse is still not the sole criterion, and he may still be negligent if his acts are unreasonable; and the question is one for the jury unless, perchance, it can elicit but one response from reasonable minds. Such is the general rule. *Prosser, Law of Torts,* 137; *Restatement, Torts, sec.* 296. And it has long had acceptance in New Jersey as a doctrine grounded in reason and logic. *Connelly v. Trenton Passenger Ry. Co.,* 56 *N. J. L.* 700 (*E. & A.* 1894); *Spalt v. Eaton, supra; Dobrow v. Hertz,* 125 *N. J. L.* 347 (*E. & A.* 1940).

Here, what occurred was plainly not beyond the realm of reasonable prevision. Experience had taught the need for protection of the carrier's passengers against hostile and dangerous acts and conduct that had become recurrent; and it was the exclusive function of the jury to assess the

318

circumstances in the context of the carrier's duty of care commensurate with the risk of harm, known or reasonably to be anticipated.

We concur in the disposition of the assignments of error directed to the charge. Even though the criticism of the particular instructions be well founded, there was not the timely objection required by *R. R.* 4:52–1 as a corrective process; and there is not the "plain error" affecting substantial rights that would justify the discretionary action permissible under *R. R.* 1:5–3(*c*).

And we find no substance to the point that the proofs "fail to disclose the violation of any duty owing by the defendant to plaintiff," and so the verdict was the result of mistake, prejudice, passion or partiality.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, JACOBS and BRENNAN—5.

*For reversal*—Justices OLIPHANT and BURLING—2.