226 N.J. Super. 377 (1988)
544 A.2d 428
NICHOLAS RICCI AND CATHERINE RICCI, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
AMERICAN AIRLINES AND TRANS NATIONAL TRAVEL AGENCY, INDIVIDUALLY AND/OR JOINTLY, SEVERALLY OR IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 11, 1988.
Decided July 14, 1988.
*378 Before Judges FURMAN, LONG and SCALERA.
*379 Lorraine D. Dicintio argued the cause for plaintiffs-appellants.
John D. Clemen argued the cause for defendants-respondents (Shanley & Fisher, attorneys; John D. Clemen, of counsel; Kevin Walker, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
In 1986, plaintiffs Nicholas Ricci and his wife, Catherine Ricci, filed a complaint against defendant American Airlines (American) alleging that Nicholas Ricci was injured on an American flight when he was assaulted by another passenger as a result of the negligent actions of American and/or its agents.[1]
American answered, denying the allegations of the complaint and moved for summary judgment. The facts, which for the purpose of the summary judgment motion were undisputed, are as follows: In February 1984, Nicholas and Catherine Ricci embarked on a 30th anniversary trip to Hawaii. They left on an American flight from Philadelphia International Airport as part of a group of 30 or 35 people, all of whom were acquainted with each other. The trip was uneventful until the couple reached San Francisco. At the airport, where they were scheduled to catch a flight to Hawaii, their final destination, they were told that the plane was overbooked and that they would have to settle for whatever seats were available. Tickets were distributed, and Mr. Ricci discovered that he would not be sitting next to his wife who was assigned a seat seven or eight rows away. Mr. Ricci was upset by these arrangements as were others on the plane. He requested that the airline personnel rectify the situation. In response, he was told again that *380 the plane had been overbooked and that "they [would] straighten it out on board."
Mr. Ricci boarded the plane and took his assigned seat in the smoking section. Sitting next to him was a younger, bearded man, wearing a suit and tie. Apparently, the bearded man was not pleased with his assigned seat in the smoking section. He and Mr. Ricci had a discussion on the subject. Mr. Ricci described the young man's manner as "sincere, he wasn't rough. He asked me if I would refrain from smoking, compromise."
Mr. Ricci responded, "Hey, there's no way I'm going to stop smoking. I'm a very heavy smoker, and I am in a smoking section, and you are not a smoker, and you are in a smoking section so you have to pay the consequences." Mr. Ricci's voice was "a little pitched up" when he said this. Nevertheless, he proposed what he considered a compromise: He said he intended to light up as soon as the "no smoking" sign was turned off, but he offered to face the aisle and blow his smoke in that direction. Mr. Ricci was into his second cigarette  he said he smokes three packs a day  and turned toward the aisle, when suddenly a hand reached across his face and snatched the cigarette from his lips. The hand belonged to the bearded man. Mr. Ricci turned and demanded, "just who the hell do you think you are?" He then "jumped" from his seat and attempted to retrieve the mangled cigarette. A scuffle ensued, and as Mr. Ricci put it, the two men exchanged "a few nice choice words." The bearded man, who was younger and stronger, grabbed Mr. Ricci by both wrists and wrestled him to his seat. During the incident, Mr. Ricci apparently clenched his teeth with such force that he cracked his denture. The whole incident took 30 seconds or a minute  "it was over that fast." Mr. Ricci "[i]nstantly" lighted another cigarette.
A few moments later, according to Mr. Ricci, a stewardess approached him and told him that he had "better behave [him]self" or the FBI would greet him at the airport in Hawaii. *381 Mr. Ricci said this warning was directed solely toward him and that the bearded man was given no admonition by the stewardess. He said he was made to feel like a "criminal." Following this, the pilot announced over the public address system that the designation of Mr. Ricci's row was being changed from smoking to nonsmoking. Mr. Ricci was then escorted by a stewardess to the smoking section at the back of the plane where he proceeded to smoke for the rest of the flight.
According to Mr. Ricci's treating psychologist, he felt victimized by what happened on the plane, became depressed and was subsequently diagnosed as suffering from post-traumatic stress disorder and reactive depression. Mr. Ricci claimed that his injury resulted from a combination of factors including, but not limited to, the separation from his wife during the flight, the assault by the fellow passenger and his treatment by the stewardess following the incident, all of which were the responsibility of American.
In support of its motion for summary judgment, American claimed that only the assault by the fellow passenger caused Mr. Ricci's injury, and that it could not be held accountable for such an unforeseeable action. The trial judge granted summary judgment, analyzing the issue this way:
We go back to our first point, was a duty breached or not breached, was a duty owed by American airlines? And the only way to answer that question is whether or not this type of conduct was reasonably foreseeable. The only way the law as a matter of policy imposes duty is that it is reasonably foreseeable that this type of breach caused that which has happened. It is the opinion of the Court this is well out of the realm of reasonable foreseeableness, and, therefore, the motion will be granted.
We disagree and reverse.
The duty of a carrier to protect its patrons is regarded as a high duty of care:
"Carriers who accept passengers entrusted to their care must use great caution to protect them, which has been described as `the utmost caution characteristic of very careful prudent men,' or `the highest possible care consistent with the nature of the undertaking,'" and this may include the relational duty to exercise control of the conduct of third persons. [Harpell v. *382 Public Service Coordinated Transport, 20 N.J. 309, 316-317 (1956), quoting Prosser, Law of Torts, (2d ed. 1955) at 119, 147, 188.]
In Harpell, where the carrier was on notice that a boy was in the habit of hurling concrete at its trolleys, yet neglected to take precautions and injury ensued, the court delineated the carrier's obligations as including a duty to provide for the safe passage of its patrons, and to protect them from reasonably foreseeable harm by fellow passengers and strangers. Harpell, supra, 20 N.J. at 317; See also Gillespie v. Brooklyn Heights R. Co., 178 N.Y. 347, 70 N.E. 857 (N.Y.Ct.App. 1904); Prosser and Keeton on Torts, (5 ed. 1984) § 56 at 383. "The duty is commensurate with the risk of harm ..." Harpell, supra, 20 N.J. at 316. Thus, a carrier must act "such as one exercising high degree of care for its passenger's safety `would under all the circumstances deem prudent to obviate the danger, known or reasonably to be anticipated....' The question is whether the wrongful act of the third person could have been reasonably anticipated." Ibid. (citations omitted).
In sum, the trial judge applied the appropriate standard in evaluating American's challenged conduct  that of reasonable foreseeability. Where we differ from him is in his application of this standard to the facts. Here, American oversold seats on its plane in order to insure that every seat was occupied. In so doing, prior group seating arrangements and requested seating could not be accommodated. It thus assigned a nonsmoker to the smoking section for a four-hour flight in an era in which nonsmokers have become increasingly concerned and vocal about the health dangers of secondary smoke. See Paolella, The Legal Rights of Nonsmokers in the Workplace, 10 U.Puget Sound L.Rev. 591-632 (Apr. 1987); No Butts About It: Smokers Must Pay for Their Pleasure, 12 Colum.J.Envtl.L. 317-341 (1987); ButtOut, The War Over Smoking, Time, Apr. 18, 1988, Shimp v. New Jersey Bell Telephone Co., 145 N.J. Super. 516 (Ch.Div. 1976). Indeed, the public's concern over this issue has engendered 14 CFR 121 and 135, FAA regulations which prohibit smoking on flights of less *383 than two hours and 14 CFR 252.2 which requires commercial airlines to provide separate seating for nonsmokers on other flights. We think that a reasonable jury could conclude that American should have foreseen a flareup between a militant nonsmoker and an intransigent smoker in the situation it created and that it should have taken appropriate safeguards to prevent it. This is particularly true in light of the fact that American knew or should have known that overbooking, switched seats and the separation of parties, in themselves, are anxiety producing situations which could well have exacerbated ordinary tensions. In this context, it is of no moment that American did not have notice of Mr. Ricci's seatmate's "violent" propensities or the likelihood that he would assault Mr. Ricci. Liability in this case does not depend on the character of the third party assailant but on the existence of a situation, created by American, which it should have known was likely to result in a skirmish. Wollerman v. Grand Union Stores, Inc., 47 N.J. 426 (1966); Bozza v. Vornado, 42 N.J. 355 (1964). The standards by which the reasonableness of a defendant's behavior are measured are not inflexible, but are fluid and subject to change according to changes in societal attitudes. Lee and Lindahl, Modern Tort Law, § 3.09 (1988). Here, society's changed attitude toward smoking, of which American should have been aware, is a pivotal factor in assessing its conduct.
We think the trial judge erred in withdrawing this issue from the jury because he thought the assault on Mr. Ricci could not have been anticipated. American did not have to foresee exactly what would happen in order to be subjected to liability. Only where the outcome is "extraordinary" is an action against the actor precluded as a matter of law. Mitchell v. Friedman, 11 N.J. Super. 344, 348 (App.Div. 1951). Otherwise, the issue should be submitted to the jury. As the Court stated in Roberts v. United States, 316 F.2d 489, 495 (3d Cir.1963):
To be subjected to liability, it is not necessary that the defendant could have foreseen the very injury which occurred, that an injury was sure to occur, the extent of the injury, or the manner in which it occurred, but rather it is *384 sufficient that defendant's conduct was a substantial factor in bringing about the injury and it knew or should have known that some injury might occur.
Here, a reasonable jury could conclude that American's conduct was a substantial factor in bringing about Mr. Ricci's injury and that it knew or should have known that an incident might occur if it placed a nonsmoker next to a smoker in a smoking section on a four-hour flight. We thus reverse the grant of summary judgment and remand this issue for trial.
We think there is a second jury issue in this case which arises out of Mr. Ricci's claims that American was under a duty to protect him from "the abusive conduct of its agents." In this case, the challenged conduct is the stewardess' admonition to Mr. Ricci, the threat of FBI involvement and the embarrassing relocation of his seat although he did not precipitate the problem with the nonsmoker. The injury claimed is humiliation and post-traumatic stress disorder.
In Gebhardt v. Public Service Coord. Transport, 48 N.J. Super. 173 (App.Div. 1957), certif. den. 25 N.J. 540 (1958), we recognized "that a carrier has a duty to protect a passenger from abusive and insulting language by its agents or employees based on its contractual relationship with the passenger." Id. at 180. Recovery is not limited to those plaintiffs who suffer physical harm as a result. Id. at 181-182. Recovery for humiliation and embarrassment is based "on the theory of quasi-tort liability arising out of a special duty owed by the carrier to the riding public." Id. at 181. Our courts have never further addressed the question of the scope of a carrier's liability for the insulting acts of its agents or the standard to be applied in such a case.
A leading New York case, Gillespie, supra, explains the policy behind imposing a duty on carriers to treat their passengers courteously and respectfully. There, plaintiff alleged that upon paying the fare, the conductor refused to return plaintiff's change, and proceeded to call plaintiff a deadbeat and a swindler in front of the other passengers aboard the streetcar. 70 *385 N.E. at 858. The court permitted the jury to determine whether plaintiff "suffered insult and indignity at the hands of the conductor, and [whether he] was treated disrespectfully and indecorously by [the conductor] under such circumstances as to occasion mental suffering, humiliation, wounded pride, and disgrace." Id. at 859.
The court explained:
The relation between a carrier and its passenger is more than a mere contract relation, as it may exist in the absence of any contract whatsoever. Any person rightfully on the cars of a railroad company is entitled to protection by the carrier, and any breach of its duty in that respect is in the nature of a tort, and recovery may be had in an action of tort as well as for a breach of the contract. * * * "The passenger is entitled not only to every precaution which can be used by the carrier for his personal safety, but also to respectful treatment from him and his servants. From the moment the relation commences, as has been seen, the passenger is, in a great measure, under the protection of the carrier, even from the violent conduct of other passengers, or of strangers who may be temporarily upon his conveyance. * * * The carrier's obligation is to carry his passenger safety and properly, and to treat him respectfully; and, if he intrusts [sic] the performance of this duty to his servants, the law holds him responsible for the manner in which they execute the trust. The law seems to be now well settled that the carrier is obliged to protect his passenger from violence and insult from whatever source arising. He is not regarded as an insurer of his passenger's safety against every possible source of danger, but he is bound to use all such reasonable precautions as human judgment and foresight are capable of to make his passenger's journey safe and comfortable. He must not only protect his passenger against the violence and insults of strangers and co-passengers, but, a fortiori, against the violence and insults of his own servants. If this duty to the passenger is not performed, if this protection is not furnished, but on the contrary, the passenger is assaulted and insulted through the negligence or willful misconduct of the carrier's servant, the carrier is necessarily responsible. And it seems to us it would be cause of profound regret if the law were otherwise. The carrier selects his own servants, and can discharge them when he pleases, and it is but reasonable that he should be responsible for the manner in which they execute their trust." [Id. quoting Thompson on Negligence, § 3186.]
See also Brown v. Fifth Avenue Coach Lines, Inc., 16 Misc.2d 692, 185 N.Y.S.2d 923 (Mun.Ct. 1959) where the court imposed liability on a carrier for the conduct of a conductor who yelled loudly at plaintiff when she remonstrated him for failing to set her off at her stop. The court concluded that his "senseless and unprovoked wrath caused the plaintiff humiliation and *386 embarrassment" (Id. at 925) and that the "contract for safe and courteous passage from the point where plaintiff boarded the carrier and the place of destination was not performed." Id. at 927. Therefore, the case was remanded for a determination of damages.
Prosser summarizes these cases as follows:
In this field the decisions have gone to considerable lengths, holding the carrier liable for language which is merely profane or indecent, or grossly insulting to people of ordinary sensibility, even though the mental disturbance is not attended by any illness or other physical consequences. Prosser, supra, § 12 at 58.
See also, 15 A.L.R.2d 108, § 13-16, Civil Liability for Insulting or Abusive Language Not Amounting to Defamation. However, "[m]ere discourtesy, as distinguished from gross insult" is not enough to sustain liability. Prosser, supra, § 12 at 58 n. 31. For example, a rough tone of voice does not rise to the level of an actionable abuse or insult. See Daniels v. Florida Cent. & P.R. Co., 62 S.C. 1, 39 S.E. 762 (Sup.Ct. 1901); and cf. Campopiano v. Rhode Island Co., 39 R.I. 105, 97 A. 597 (Sup.Ct. 1916).
Here, Mr. Ricci was seated by the airline in the smoking section of the plane and proceeded to smoke. According to his version, he did nothing to cause a disruption or to instigate the attack by the nonsmoker. The nonsmoker attacked him. Nevertheless, the stewardess admonished Mr. Ricci and not the nonsmoker. She specifically threatened to call the FBI to meet Mr. Ricci upon landing. The pilot then announced that Mr. Ricci's entire row was no longer a smoking row. A few minutes later Mr. Ricci was escorted through the plane to the back although he did not wish to move. None of what took place was in any way precipitated by Mr. Ricci, yet the stewardess threatened him with a criminal sanction. We think a reasonable jury could find that under the facts presented that the conduct of the stewardess was abusive and insulting and that American breached a duty to Mr. Ricci in not protecting him from it. On remand, this will be a jury issue, in addition to *387 that involving American's obligation to protect its passengers from reasonably foreseeable harm.
NOTES
[1] The complaint also claimed negligence on the part of the tour package seller, Trans National Travel Agency. However, this agency was never served and thus, did not participate below.