NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4458-13T2

JOHN M. GATELY and
PATTY SUE GATELY (h/w),

     Plaintiffs-Appellants,

v.

HAMILTON MEMORIAL HOME, INC.,
d/b/a BRENNA-CELLINI FUNERAL
HOME, and MARIA E. BRENNA,

     Defendants-Respondents.

_____

APPROVED FOR PUBLICATION

October 22, 2015

APPELLATE DIVISION

Argued September 21, 2015 - Decided October 22, 2015

Before Judges Sabatino, Accurso, and O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-2047-11.

Gary F. Piserchia argued the cause for appellants (Parker McCay, P.A., attorneys; Stacy L. Moore, Jr., of counsel; Mr. Piserchia, on the brief).

Lionel J. Frank argued the cause for respondent Hamilton Memorial Home, Inc., and for respondent Maria E. Brenna only as to Counts One and Three of the Amended Complaint (Szaferman, Lakind, Blumstein & Blader, P.C., attorneys; Mr. Frank, Jeffrey P. Blumstein, and Melissa A. Chimbangu, on the brief).

William E. Paulus argued the cause for respondent Maria A. Brenna as to Counts Two

and Four of the Amended Complaint (Law Office of Gerard M. Green, attorneys; Mr. Paulus, on the brief).

The opinion of the court was delivered by,

SABATINO, P.J.A.D.

This appeal arises out of a no-cause jury verdict rejecting a father's claims that a funeral home wrongfully released the remains of his adult son for cremation without the father's authorization. The father contends that he told an individual employed by the home (known in the trade as an "intern") that he did not want his son to be cremated. He claims that the intern and funeral home ignored his protestations and instead improperly acceded to the contrary direction of the decedent's mother. The father and his current wife, as co-plaintiffs, argue that the trial court erred by instructing the jury that defendants' conduct is subject to protection under qualified statutory immunities, and that the verdict was unjust and against the weight of the evidence.

The main and novel legal issue presented to us is whether the qualified immunity from civil liability granted to funeral directors under N.J.S.A. 45:7-95 and N.J.S.A. 45:27-22(d) extends to interns who are employed by funeral homes pursuant to regulations issued by the State Board of Mortuary Science. The immunity precludes liability unless the defendant had

"reasonable notice" of untrue representations or a lack of authorization by the surviving next of kin.

We conclude that the statutory immunity does extend to such interns, and that the trial judge consequently did not err in charging the elements of the immunity to the jury. We further conclude that the verdict was not against the weight of the evidence, and that there are no other grounds for ordering a new trial.

I.

On October 16, 2009, John R. Gately, son of Kathleen Cousminer and plaintiff John M. Gately, was killed in an automobile accident.[1] Cousminer and Gately divorced in 1988 or 1989 when their son was about five years old. Both parents have since remarried.

Although Cousminer had custody of the son while he was a minor, Gately contends he had a close relationship with the young man. At the time of his death, the son was living with Cousminer in New Jersey. Plaintiffs were residing in Florida.

---

[1] To avoid confusion, we refer to John M. Gately as "Gately," his current wife Patty Sue Gately as "Patty" and the deceased as the "son." In doing so, we intend no disrespect. Gately and Patty collectively will be referred to as "plaintiffs."

Following the son's death, Cousminer's husband called Brenna-Cellini Funeral Home[2] and set up an appointment for Monday, October 19, 2009 to make the funeral arrangements. Cousminer and her husband met with defendant Maria E. Brenna, who was then a licensed intern employed by the home, to make the arrangements. Cousminer stated that she wanted the son cremated. She signed a Cremation Authorization and Disposition Order (the "Authorization Form") supplied to her by Brenna. Among other things, the Authorization Form certified that the signer "is of mature age and alone [has] the right [to] give this authorization and direction for said cremation, and that no other person has such right[.]"

The home's funeral director, Joe D'Errico,[3] was in an adjoining room while those arrangements were being made. According to Brenna, D'Errico was not required to be in the room with the customer but he had to be available to review and sign the documents. Brenna testified that D'Errico escorted Cousminer into the funeral home, and that he was present when she met with them.

---

[2] This is the business name for defendant Hamilton Memorial Home, Inc. The "Brenna" in the funeral home's name is the surname of the individual co-defendant.

[3] According to Brenna's testimony, as of the time of trial, she and D'Errico were "partners" in the funeral home.

After the arrangements were made, Cousminer had a conversation with her ex-husband Gately, who told her he did not want their son to be cremated. According to her testimony, Cousminer did not tell Brenna that Gately objected to the cremation.

Gately testified that he spoke to Brenna by telephone on Monday, October 19, and told Brenna he did not want the son to be cremated. Gately claimed that Brenna told him he had no choice in the matter and that she hung up on him. Corroborating her husband's account, Patty testified that she overheard Gately's conversation with Brenna and that he told Brenna he did not want the son cremated.

A viewing was held at the funeral home on Wednesday, October 21. Gately testified that he confronted Brenna at the viewing and again told her he did not want the son cremated. She allegedly responded that he had no say in the matter. Patty similarly testified that she saw Gately confront Brenna, and heard him repeat that he did not want the son cremated. In addition, Gately's cousin testified that he was with Gately when he confronted Brenna and heard Gately object to the cremation.

A-4458-13T2

The funeral was held on Thursday, October 22.[4]  Contrary to plaintiff's testimony, Cousminer testified that Gately did not express an objection to the cremation to her, either at the viewing or at the funeral.  The son was cremated after his funeral on that same day.

In her own testimony, Brenna insisted that neither plaintiffs nor Cousminer ever told her that Gately did not want the son cremated.  Brenna acknowledged that she spoke to plaintiffs by telephone on October 19, but stated the discussion was limited to obtaining information for the obituary.  She testified that there was no discussion whatsoever about the son being cremated.

Brenna denied discussing the cremation with Gately at the viewing.  She testified that her only conversation with plaintiffs at the viewing was to express her condolences.  Moreover, according to Brenna, her only conversation with plaintiffs on the day of the funeral was to comply with their request for a lock of the son's hair and to provide a brochure of mementos.

Brenna testified that she "would not have moved forward with [the] cremation had there been any indication that there

---

[4] Gately testified that on the day of the funeral he again told Cousminer he did not want their son cremated and that she would not reconsider.

was an objection." As Brenna explained it, she would have advised the parents that they needed to reach an agreement if such an objection had been raised; otherwise, the body would be buried. Brenna acknowledged that she did not seek authorization from Gately for the cremation. She did point out that, "from a business point of view," she would have been "more than happy" to forego the cremation.

At her deposition Brenna did not recall telling Cousminer that both parents had to be in agreement regarding cremation. However, at trial Brenna testified that she did tell Cousminer that.

Cousminer testified that Brenna did not ask her if Gately had agreed to cremation. Cousminer did not recall discussing with Brenna whether she had authority to speak for Gately. Cousminer did acknowledge that Brenna did not influence her decision to have the son cremated.

In August 2011, plaintiffs filed a complaint in the Law Division against the funeral home and Brenna, alleging intentional infliction of emotional distress (count one), negligent infliction of emotional distress (count two), a claim of punitive damages (count three), and a loss of consortium (count four). Defendants denied liability. Among other things, defendants invoked the immunity provisions set forth in the New

Jersey Cemetery Act, N.J.S.A. 45:27-1 to -41, and the Mortuary Science Act ("MSA"), N.J.S.A. 45:7-32 to -95.

Under the Cemetery Act,

> [a] person who signs an authorization for the funeral and disposition of human remains warrants the truth of the facts stated, the identity of the person whose remains are disposed and the authority to order the disposition. The person shall be liable for damages caused by a false statement or breach of warranty. A cemetery or funeral director shall not be liable for disposition in accordance with the authorization unless it had reasonable notice that the representations were untrue or that the person lacked the right to control the disposition.
>
> [N.J.S.A. 45:27-22(d) (emphasis added).]

Likewise, under the Mortuary Science Act,

> [a] funeral director may permit the funeral, disinterment or disposition of human remains on the written authorization of a person who claims to be, and is believed to be, a person who has the right to control the funeral, disinterment or disposition as provided by sections 22 and 23 of P.L. 2003, c. 261 (C.45:27-22 and 45:27-23). A cemetery or funeral director shall not be liable for the funeral, disinterment or disposition pursuant to this authorization unless it had reasonable notice that the person did not have the right to control the funeral, disinterment or disposition. . . .
>
> A person who signs an authorization for the funeral, disinterment or disposition of human remains warrants the truth of the facts stated, the identity of the person whose remains are disposed, and the authority to order the funeral, disinterment

or disposition. <u>A cemetery or funeral director shall not be liable for the funeral, disinterment or disposition in accordance with the authorization unless it had reasonable notice that the representations were untrue or that the person lacked the right to control the funeral, disinterment or disposition.</u>

[<u>N.J.S.A.</u> 45:7-95 (emphasis added).]

Defendants moved for summary judgment prior to trial contending that these statutes immunized their conduct in this case. Plaintiffs, in opposition, argued that the immunities were inapplicable. The trial court denied those motions[5] and the case proceeded to trial in March 2014.

The critical factual issue at trial was whether or not Gately had told Brenna, either before or at the funeral, that he objected to his son's cremation. That factual dispute was a focal point of counsel's opening statement and summations.

During the course of the jury charge, the trial judge instructed the jurors on the traditional elements of negligence, intentional and negligent infliction of emotional distress, proximate causation, and damages. With the acquiescence of all counsel, the judge also charged the jury regarding the immunity

---

[5] The judge who heard the motions was not the same one who later presided over the trial.

statutes.  In that regard, the judge provided the following guidance:

> In this case, the plaintiff[6] has separate claims against the defendants.  One is for intentional infliction of emotional distress.  The second one is for negligent infliction of emotional distress.  The basis for each claim is that the defendant violated a law that governs the funeral and disposition of decedents.

> In summary, that law provides as follows.  Both surviving parents have the right to control the funeral and disposition of the human remains under these circumstances.  The funeral director may permit the funeral of [sic] disposition of human remains and [sic] <u>the written authorization of a person who claims to be and is believed to be a person who has the right to control the funeral or the disposition.  The funeral director shall not be liable for the funeral or disposition pursuant to this authorization unless it had reasonable notice that the representations were untrue or that the person lacked the right to control the funeral or disposition</u>.

> In this case, you will be asked to decide whether the plaintiff has established by a preponderance of the evidence whether the defendant negligently and/or recklessly or intentionally violated this law.

> [(Emphasis added).]

---

[6] Although the transcript indicates that the judge used the singular term "plaintiff," it is obvious from the context that he meant to include the claims of both plaintiffs in his instruction.  Likewise, his reference in this passage to the "defendant" in the singular appears to be either a transcription error or a slip of the tongue.

A-4458-13T2

The jury returned a unanimous verdict in favor of defendants as to all counts in the complaint. Specifically, the jury answered "no" to the question on the verdict form, "Has the plaintiff proven by a preponderance of the evidence that the defendant[7] negligently violated the law regarding the funeral or disposition of [the son]?" Similarly, all the jurors responded "no" to the question, "Has the plaintiff proven by a preponderance of the evidence that the defendant intentionally or recklessly violated the law regarding the funeral or disposition of [the son]?"

Following the adverse verdict, plaintiffs moved for a new trial. The trial court denied that application and this appeal ensued.

## II.

The primary legal issue that plaintiffs raise on appeal[8] is whether the qualified immunity provisions set forth in N.J.S.A.

---

[7] Although the transcript uses the term "defendant" in the singular, it is clear from the context that the question was intended to cover both defendants.

[8] We reject defendants' contention that plaintiffs did not adequately raise this legal issue in the trial court. In any event, the novel questions presented here concerning the actual scope of the statutory immunity provisions sufficiently implicate the public interest to warrant our consideration of those matters. See Nieder v. Royal Indemn. Ins. Co., 62 N.J. 229, 234 (1973).

45:27-22(d) and N.J.S.A. 45:7-95 cover persons such as Brenna employed as what are known in the funeral business as "interns." The trial court's jury instructions presumed that such interns are included within the ambit of the statutory immunities. For the following reasons, we agree with that premise, and reject plaintiffs' more narrow construction of the statutes.

A.

The present regulation of funeral homes in New Jersey is mainly governed by statutory provisions within the MSA, N.J.S.A. 45:7-32 to -95, and associated regulations administered by the State Board of Mortuary Science ("the Mortuary Board"), N.J.A.C. 13:36-1.1 to -11.19. In addition, the funeral profession is also affected by portions of the Cemetery Act, N.J.S.A. 45:27-1 to -41, which is enforced by the State Cemetery Board (the "Cemetery Board"), N.J.S.A. 45:27-3. Both the Mortuary Board and the Cemetery Board are within the Division of Consumer Affairs of the Department of Law and Public Safety. See N.J.S.A. 45:7-35 (Mortuary Board); N.J.S.A. 45:27-3 (Cemetery Board).

In enacting the MSA, the Legislature recognized that "the practice of mortuary science and the practice of embalming and funeral directing are . . . occupations charged with a high degree of public interest and subject to strict regulation and

12                                                    A-4458-13T2

control." N.J.S.A. 45:7-33. The MSA vests the Mortuary Board with the authority to adopt rules and regulations to enforce the statute's provisions. N.J.S.A. 45:7-35, -37. The Board is "specifically empowered to adopt rules and regulations concerning . . . trainees, apprentices and preceptors[.]" N.J.S.A. 45:7-38.

To become a licensed funeral director in New Jersey, a person must, among other requirements, "complete[] 2 years of practical training and experience as a registered trainee[.]" N.J.S.A. 45:7-49(a)(2). The MSA prohibits a person from "engag[ing] in the practice of mortuary science, embalming or funeral directing" unless licensed by the Board but makes an exception for a "registered trainee working under the direct supervision of a practitioner of mortuary science." N.J.S.A. 45:7-47.

The term "registered trainee" is defined in the MSA as follows:

> (i) "Registered trainee" means a person who is duly registered with the board and who is engaged in the State of New Jersey in learning to practice as a practitioner of mortuary science under the personal instruction and supervision of a person duly licensed as a practitioner of mortuary science and who has an annual case volume as hereinafter provided in [N.J.S.A. 45:7-45].
>
> [N.J.S.A. 45:7-34(i).]

A-4458-13T2

In recent years, the term "intern" has been used in the Mortuary Board's pertinent regulations instead of the term "registered trainee." See 16 N.J.R. 505(a), 508-09 (Mar. 19, 1984) (rule proposal); 16 N.J.R. 2143(b), 2145-46 (Aug. 6, 1984) (rule adoption). As the term is now defined, "intern" is "a person registered with the Board who is engaged in learning to practice as a practitioner of mortuary science under the supervision of a Board licensee, and includes registered trainees." N.J.A.C. 13:36-1.2.

The Mortuary Board has promulgated detailed regulations governing the training of interns and the practice of mortuary science and funeral directing by interns. N.J.A.C. 13:36-2.1 to -2.15. "Preceptors" in the trade must ensure that interns are proficient in "[m]aking funeral arrangements with families, which includes attending funeral arrangement conferences, selling of merchandise, taking statistical information from families, filing death certificates, preparing obituary notices and placing such notices with newspapers, and attending viewings[.]" N.J.A.C. 13:36-2.14(a)(2). Further, the regulations recognize that interns are granted legal authority to make funeral arrangements. See N.J.S.A. 45:7-47 (exempting "registered trainee[s] working under the direct supervision of a practitioner of mortuary science" from the MSA's general

14                                                    A-4458-13T2

licensure requirements).   In that regard, N.J.A.C. 13:36-8.9 mandates that "[n]o unlicensed person shall be permitted to make funeral arrangements on behalf of any licensed practitioner of mortuary science, except that interns may make such arrangements pursuant to N.J.S.A. 45:7-47." (Emphasis added).

The manifest purpose of these provisions concerning registered trainees (now "interns") is to provide persons who are entering the mortuary business with an extensive opportunity to learn their craft under the supervision of a preceptor. The statutes and allied regulations contemplate that the intern will carry out a wide range of responsibilities, including having interactions with customers and family members of the decedents.

N.J.S.A. 45:7-34(f) defines a "funeral director" as "a qualified person who practices or engages in funeral directing[.]"   "Funeral directing" includes "engaging in or making . . . funeral arrangements[.]"   N.J.S.A. 45:7-34(c). Both N.J.S.A. 45:7-47 and N.J.A.C. 13:36-8.9 allow interns who are "working under the direct supervision of a practitioner of mortuary science" to engage in the practice of funeral directing, including making funeral arrangements. Thus, by the plain language of these provisions, interns are encompassed within the term "funeral director" under the MSA, as they are

qualified by statute and the associated regulations to engage in funeral directing.

B.

Before we address the specific question of whether the statutory immunities cover interns, we first provide a context concerning the codified provisions dealing with the disposition of a decedent's remains.

One of the important functions of persons who work in the mortuary business is assuring the proper disposition of each decedent's remains, whether by burial or by cremation. This time-sensitive function is guided by the previously-expressed intentions of the decedent or, in the absence of such instructions, by the direction of the decedent's next of kin.

The Cemetery Act addresses who may control the funeral and disposition of a decedent's remains. If the decedent has not left a will appointing a person to control disposition and has no surviving spouse or adult children, the statute provides that the right to control the funeral and disposition of the remains passes to "[t]he surviving parent or parents of the decedent." N.J.S.A. 45:27-22(a)(3) (emphasis added).

The regulations promulgated by the Cemetery Board and the Mortuary Board do not specifically address who has the right to authorize cremation when there are two surviving parents. See

16

N.J.A.C. 13:36-1.1 to -11.19; N.J.A.C. 13:44J-1.1 to -15.3.  The

parties have not cited and we have not found any case law

interpreting the "surviving parent or parents" clause of

N.J.S.A. 45:27-22(a)(3).  We also have found no other reported

opinion from another state interpreting similar language.[9]

The question as to whether in the present case Cousminer

had the sole authority to authorize her son's cremation thus

depends on whether the word "or" in the statute is disjunctive

(meaning that either one or both surviving parents can control

disposition), or, alternatively, is conjunctive (meaning to

convey that when there are two surviving parents both share a

joint right to control disposition and must agree on that

disposition).

"Generally courts presume that 'or' is used in a statute

disjunctively unless there is clear legislative intent to the

contrary."  Norman J. Singer & J.D. Shambie Singer, Sutherland

Statutory Construction § 21:14 (7th ed. 2009); see, e.g., Cox v.

Sears Roebuck & Co., 138 N.J. 2, 19 (1994) (interpreting the

Legislature's use of the word "or" in the Consumer Fraud Act,

---

[9] The practices in other jurisdictions widely vary.  See Ann M. Murphy, Please Don't Bury Me Down in That Cold Cold Ground:  The Need for Uniform Laws on the Disposition of Human Remains, 15 Elder L.J. 381 (2007) (canvassing the differing statutes and regulations for funeral home and cemetery operations within other states).

N.J.S.A. 56:8-2, as evidence that the Legislature intended for the statute's requirement of "any unconscionable commercial practice, deception, fraud, . . . or the knowing concealment, suppression, or omission of any material fact" to be a disjunctive condition); see also Atl. Container, Inc. v. Twp. of Eagleswood Planning Bd., 321 N.J. Super. 261, 270 n.4 (App. Div. 1999) (observing that the word "or" is ordinarily "considered a disjunctive particle indicating an alternative") (citation omitted); State v. Smith, 262 N.J. Super. 487, 506 (App. Div.), certif. denied, 134 N.J. 476 (1993) (observing that "[p]urely as a matter of grammar . . . [w]hen items in a list are joined by a comma or semicolon, with an 'or' preceding the last item, the items are disjunctive"). We recognize, however, that the word "or" has at times been "interpreted to mean the conjunctive if [that meaning] is more consistent with legislative intent." In re Raymour & Flanigan Furniture, 405 N.J. Super. 367, 384 (App. Div. 2009) (quoting Wildwood Storage Ctr., Inc. v. Mayor & Council of Wildwood, 260 N.J. Super. 464, 471 (App. Div. 1992)).

Applying these principles, we conclude that the most logical construction of the phrase "surviving parent or parents of the decedent" within N.J.S.A. 45:27-22(a)(3) requires the provision to be construed in the conjunctive if there is more than one surviving parent. The term "surviving parent"

(expressed in the singular) is encompassed by the phrase "surviving parents" (expressed in the plural). We do not presume that the Legislature would choose to use redundant terms in a statute, but rather generally strive to adopt an interpretation that gives meaning to every word. <u>See, e.g.</u>, <u>McCann v. Clerk of Jersey City</u>, 167 <u>N.J.</u> 311, 321 (2001); <u>Finkel v. Twp. Comm. of Hopewell</u>, 434 <u>N.J. Super.</u> 303, 321 (App. Div. 2013); <u>State v. Malik</u>, 365 <u>N.J. Super.</u> 267, 278 (App. Div. 2003), <u>certif. denied</u>, 180 <u>N.J.</u> 354 (2004).

The hierarchical structure of the statutes themselves sheds light on the question. In <u>Marino v. Marino</u>, 200 <u>N.J.</u> 315, 332 (2009), the Supreme Court discussed the purpose of the hierarchy of decision-making dictated by <u>N.J.S.A.</u> 45:27-22(a):

> To begin with, when someone dies, <u>the need for a clear demarcation between who may decide on burial and the order of preference to be given to those who might otherwise have a voice in the matter is paramount. The corollary need for an efficient mechanism to avoid, or to end quickly, disputes among those who might disagree is of almost equal significance</u>.

> The Legislature's amendment to the statute in 2003 makes particularly clear its intention to afford little room for dispute about interment in the first instance. Although embracing the notion that a decedent desiring to decide the disposition of his or her remains is entitled to have that expression of intent effectuated, <u>the Legislature limited the means of doing so in a clear effort to prevent both disputes and</u>

delays. By requiring that the directions be in writing and by requiring that the writing be in a will . . . the Legislature greatly reduced the possibility that burial would be delayed while survivors battled over the decedent's preferences.

That is not to say that the statute can never give rise to a dispute, the effect of which will be to delay the interment of a decedent's remains. . . . Moreover, in spite of the Legislature's effort to create a clear hierarchy to be followed in the absence of a directive in a will, disputes might arise if, for example, there is no surviving spouse and no majority among the surviving adult children who agree. The Legislature's rejection of the [Law Revision] Commission's recommended deletion of the language relating to court orders demonstrates its recognition that the court is empowered to, and may, act to resolve disputes.

[(Emphasis added).]

The Court further observed that the codified hierarchy among a decedent's next of kin was an "effort to create . . . a scheme of priorities so clear and plain that it will rarely lead to a dispute requiring intervention by the courts[.]" Id. at 333.

A reading of the phrase "the surviving parent or parents" to allow either surviving parent alone to control the disposition of the decedent's remains would probably further the goal of expeditiously proceeding with the arrangements. Nevertheless, we conclude that the more sensible reading of the phrase is that where there are two surviving parents, a single

parent alone does not have the unilateral right to control disposition.

This conclusion to read the statutory phrase as a conjunctive provision in situations when both parents are still living is consistent with the words of the provision considered in proper context. Instead of stating "a surviving parent or parents[,]" the statute states "the surviving parent or parents." N.J.S.A. 45:27-22(a)(3) (emphasis added). The use of the article "the" immediately in front of the term "surviving parent" signifies that when there is only one surviving parent, the right of decision is conferred upon that parent alone. Conversely, if both parents are surviving, then the decision-making authority presumptively is to be jointly exercised.

Had the Legislature intended to give either surviving parent the singular right to control disposition, it could have so stated, as is the case in the laws of some other jurisdictions. Cf. Tex. Health & Safety Code Ann. § 711.002(a)(4) (2014) (giving right to control disposition of remains to "either one of the decedent's surviving parents"); N.Y. Pub. Health Law § 4201(2)(a)(iv) (giving right to control disposition of remains to "either of the decedent's surviving parents"). By comparison, in conferring the right of disposition to a decedent's surviving adult children or the

decedent's brothers and sisters, our own Legislature saw fit to require agreement by a majority of the survivors in that class of persons.  N.J.S.A. 45:27-22(a)(2), (4).  It seems unlikely that the Legislature would have intended to elevate the wishes of one surviving parent over the other, when among other groups of surviving relatives it requires majority agreement or mutual acquiescence.

Having so construed the statutes to confer on each surviving parent an equal presumptive say in the disposition of their child's remains, the question then arises as to what should or can be done in instances when there is no mutual agreement or acquiescence.  Significantly, there is nothing expressed in the MSA or in the Cemetery Act, nor in the associated regulations, that requires a funeral director to obtain authorization from all parties who have the right to control the disposition.

For example, before the decision-making right passes down the hierarchy to the surviving parents, it rests with the "majority of the surviving adult children."  N.J.S.A. 45:27-22(a)(2).  If there are no surviving adult children or parents, the right then passes to "[a] majority of the brothers and sisters of the decedent."  N.J.S.A. 45:27-22(a)(4).  There is nothing in the statutes or regulations that expressly requires

each _member_ of those majorities to individually authorize a disposition of the remains. Likewise, nothing expressed in the statutes or regulations requires the funeral director or home to obtain individualized authorization from surviving parents.

In fact, N.J.S.A. 45:7-95 permits a funeral director to dispose of human remains "on the written authorization of a person who claims to be, and is believed to be, a person who has the right to control the . . . disposition as provided by [N.J.S.A. 45:27-22]." (Emphasis added). Hence, the plain language of the statute indicates that the funeral director does not have an affirmative duty to obtain authorizations from all parties who have a right to control disposition. Instead of obligating the funeral director to obtain such explicit assent from both surviving parents, the statutory and regulatory scheme permits the director to proceed with the written authorization provided by a surviving parent who "claims to be and is believed to be entitled to make the decision," subject to the "reasonable notice" caveat that we shall discuss, _infra_, in Part II(C).

Plaintiffs argue that the statutes and regulations should be construed to impose upon funeral directors an affirmative duty to inquire of both surviving parents before assuming that the written directive from one of those parents claiming to be authorized to make the decision can be treated as valid.

23                                                    A-4458-13T2

Although imposing such a duty might have some advantages, it also might precipitate undue delays in the disposition of the decedent's remains while the other relatives with authority are tracked down and individually consulted. For example, if plaintiffs' proposed principle of mandatory consultation were extended, say, to a family of seven children who survived an intestate widowed parent, it might take considerable time and effort to solicit the views of all seven of those siblings. It is not inconceivable that some of those siblings may be too grief-stricken to want to discuss the subject or weigh in on the decision. There also may be logistical impediments to making timely contact with each of them.

Given these — and possibly many other — consequences of imposing a duty of individual consultation, and the absence of clear mandate establishing such a duty within the present statutes and regulations, we will not impose this policy choice. Instead, we defer to the democratic authority of the Legislature, as well as the administrative expertise of the Mortuary Board and the Cemetery Board, to consider the wisdom of amending the statutes and regulations to create such a duty of consultation. Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 547 (2009); Lourdes Medical Ctr. of Burlington Cty. v. Bd. of Review, 197 N.J. 339, 366 (2009).

With this backdrop, we now turn to the qualified immunity[10] provisions that appear in both the MSA at N.J.S.A. 45:7-95 and in the Cemetery Act at N.J.S.A. 45:27-22(d). The legislative histories of these statutes indicate that the immunity was first enacted within the Cemetery Act, dating back to at least 1971. See N.J.S.A. 8A:5-19 (repealed 2003); L. 1971, c. 333. The immunity for funeral directors in the MSA appears to have been enacted in 2003, at the same time that the Cemetery Act was recodified. See L. 2003, c. 261.

In their present form, both statutes confer qualified immunity for the disposition of remains in accordance with an authorization received from the decedent's next of kin unless the defendant had "reasonable notice" that the representations made by the surviving relative were "untrue" or that the person "lacked the right to control" the disposition. N.J.S.A. 45:7-95; N.J.S.A. 45:27-22(d). The adjective "reasonable" in the phrase "reasonable notice" connotes an objective standard, founded upon the notion of a reasonable person in the

_____

[10] As case law recognizes, at times the Legislature has conferred qualified or limited immunity on private organizations to promote certain public policies and to allocate risks. See, e.g., Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 196 (2010)(applying the qualified immunity conferred by the Equine Act, N.J.S.A. 5:15-1, upon defendants for certain equestrian activities, subject to enumerated exceptions).

defendant's position. Scully v. Fitzgerald, 179 N.J. 114, 125-26 (2004). Such an objective standard of reasonableness is harmonious with the norms of traditional negligence law. See Model Jury Charge (Civil) 5.10A(2) (generally defining negligence as "a failure to use that degree of care, precaution and vigilance which a reasonably prudent person would use under the same or similar circumstances"); see also People Express Airlines v. Consol. Rail Corp., 100 N.J. 246, 262 (1985); Harpell v. Pub. Serv. Coordinated Transp., 20 N.J. 309, 316 (1956).

In adopting qualified immunity provisions within the MSA and the Cemetery Act using this objective standard, the Legislature surely recognized that funeral professionals can sometimes confront difficult situations in which the authorization provided by a surviving relative might be challenged by another relative after the burial or cremation has taken place. The statutory scheme contemplates that if the funeral director had not been timely provided with "reasonable notice" of disagreement among the survivors or a lack of valid authority by the relative who is making the funeral arrangements, then the director is relieved of the burden of defending his or her conduct in a lawsuit and being exposed to financial tort liability. Conversely, if such "reasonable

notice" had been expressed, but was ignored, then the defendant faces potential liability if the other elements of a cause of action are established. The statute thus provides a limited shield of protection, contingent upon whether there is persuasive proof of reasonable notice.[11]

There is nothing in the text of the applicable statutes or regulations that precludes an intern serving under the supervision of a preceptor from receiving the protection of this qualified immunity. Moreover, from a functional perspective, it makes sense for this statutory immunity to extend to such supervised interns. Without that financial shield, funeral homes and funeral directors presumably would be loathe to hire interns or to assume the responsibilities of a preceptor, or would be reluctant to delegate tasks to the interns that could spawn future litigation.

In the present case, there was evidence that the intern, Brenna, was in fact supervised by the funeral director D'Errico in the course of her work, including the funeral arrangements in this case. As a matter of law, we hold that Brenna was entitled as an intern to the qualified protection conferred by N.J.S.A.

---

[11] The statutes and regulations do not specify how a funeral home is to proceed if it does receive reasonable notice that the surviving parents disagree about the disposition of their child's remains. We suggest the Mortuary Board consider addressing this predicament explicitly within the regulations.

27

45:7-95 and <u>N.J.S.A.</u> 45:27-22(d), assuming that "reasonable notice" of the father's objections to the cremation had not been provided.

Case-dispositive questions of reasonableness in tort actions are commonly questions of fact for the jury (or the judge in a bench trial). <u>See, e.g.</u>, <u>Jerkins v. Anderson</u>, 191 <u>N.J.</u> 285, 305-06 (2007) (holding that the "reasonableness" of a defendant's efforts in discharging a duty of care is a question for the trier of fact when the record does not permit summary judgment); <u>Burke v. Briggs</u>, 239 <u>N.J. Super.</u> 269, 274 (App. Div. 1990) (observing in a negligence case not involving a claim of intentional tort or strict liability, that the "ultimate question for the trier of facts to determine . . . is one of negligence or reasonableness"). Those assessments often turn on questions of the credibility of the testifying witnesses. <u>Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.</u>, 65 <u>N.J.</u> 474, 484 (1974); <u>see also</u> <u>State v. Nash</u>, 212 <u>N.J.</u> 518, 553 (2013) (reiterating the long-established principle that jurors are "well-suited to determine each witness's knowledge, bias, consistency and overall credibility").

Here, the crucial factual question at trial was whether Gately, as he insisted in his testimony, told Brenna that he objected to the cremation of his son. Brenna repeatedly denied

in her own testimony that Gately communicated any such objection to her, either before or at the funeral.

The factual dispute accordingly boiled down to a classic determination of credibility. The jury was given the opportunity to believe plaintiffs' witnesses on the subject and disbelieve Brenna. Its unanimous verdict for the defense signifies that it was unpersuaded by plaintiffs' proofs and their claims of reasonable notice.

We cannot conclude from our reading of the cold transcript that the jury's conclusion was manifestly against the weight of the evidence. R. 2:10-1; State v. Sims, 65 N.J. 359, 373-74 (1974). The jury obviously found Brenna's account of events more credible than the conflicting testimony of plaintiffs' witnesses. We therefore sustain the verdict.

In upholding the jury's verdict finding no liability here by defendants, we emphasize our limited role as a court of appellate review. We did not see or hear the trial witnesses. Nor did we write the statutes that it is our obligation to enforce. We certainly do not wish to exacerbate the emotional pain of a grieving parent who has lost his adult child far too soon. Even so, the jury has literally spoken in this case, and we discern no legally compelling reason or "miscarriage of justice" to disturb the outcome. See R. 2:10-1.

III.

We see no merit in plaintiffs' secondary argument that the jury instructions concerning the immunity statutes were inadequate or improper. Trial counsel were provided ample opportunity to object to the jury charge and to advocate different language in those instructions. "[W]hen [a] party fails to object, the reviewing court must determine whether any error in the charge was 'of such a nature as to have been clearly capable of producing an unjust result.'" Toto v. Ensuar, 196 N.J. 134, 144 (2008) (quoting R. 2:10-2). Here there was no such plain error.

Although the charge provided here conceivably could have been more detailed, the charge sufficiently tracked the key "reasonable notice" facet of the immunity statutes. The charge was clear and understandable, and consistent with the law. The trial court did not err in issuing it, nor in denying plaintiffs' motion for a new trial claiming error.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION